**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------X    Index No.:

STEVEN LEBETKIN,

                Plaintiff,

                                                  **SUMMONS**

      -against-

                                                Plaintiff designates:

AYSE GIRAY a/k/a/ SARA BARAN,               New York County as the

LEWIS SASSOON, ESQ.,                        Place of Trial

SASSOON & CYMROT, LLP and

JOHN DOES 1through 25,

                                            The basis of venue is

                            Defendants.           Plaintiff's Domicile

-------------------------------------------------------------------X

**TO THE ABOVE NAMED DEFENDANT(S):**

      **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your Verified Answer on the plaintiffs' attorneys within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       September 5, 2018

                                     Yours, etc.,

                                     ***/S/ Paul W. Verner***
                                     Paul W. Verner, Esq.
                                     VERNER SIMON
                                     30 Wall Street, 8th Floor
                                     New York, New York 10005
                                     212-502-5500
                                     pwverner@vernerlaw.com
                                     *Attorneys for Plaintiff*

TO:

AYSE GIRAY
5600 N. Flagler Dr., Apt 709
West Palm Beach, FL 33407

LEWIS SASSOON, ESQ.
84 State Street, 8th Floor
Boston, MA 02109

SASSOON & CYMROT, LLP
84 State Street, 8th Floor
Boston, MA 02109

**SUPREME COURT FOR THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

STEVEN LEBETKIN,

                Plaintiff,

     v.

AYSE GIRAY a/k/a/ SARA BARAN,
LEWIS SASSOON, ESQ.,
SASSOON & CYMROT, LLP, and

JOHN DOES 1through 25,

               Defendants.

Index No.:

**VERIFIED COMPLAINT**

---

Plaintiff, STEVEN LEBETKIN, by and through his attorneys, Verner Simon and Paul W. Verner, as and for his Complaint against Defendants, AYSE GIRAY a/k/a/ SARA BARAN, LEWIS SASSOON, ESQ. and SASSOON & CYMROT, LLP, hereby alleges as follows:

## <u>PARTIES</u>

1.     Plaintiff, Steven Lebetkin ("Lebetkin"), is a resident of the County of New York, State of New York, with an address of 55 Bethune Street, New York, New York 10014.

2.     The Defendant, Ayse Giray, a/k/a Sara Baran ("Giray") is a resident of the Palm Beach County, State of Florida, with an address of 5600 N. Flagler Dr., Apt 709, West Palm Beach, FL 33407.

3.     Lewis Sassoon is an attorney admitted to practice in the State of Massachusetts and maintains an office at 84 State Street, 8th Floor, Boston, MA 02109.

4.      Sassoon & Cymrot, LLP, is a limited liability partnership formed under the laws
of the state of Massachusetts and engaged in the practice of law with its principal place
of business located at 84 State Street, 8th Floor, Boston, MA 02109.

## JURISDICTION/VENUE

5.      Jurisdiction and venue if proper in this Court and the Court may exercise
personal jurisdiction over the Defendants because their actions and omissions occurred
with the State of New York, County of New York, and the Plaintiff suffered injury
within this State.

## FACTS

### The Giray v. Chobani Claims/Lawsuit

6.      Many of the facts relevant to this Action are derived or otherwise result from the
Complaint in a $530 Million lawsuit previously brought in this Court entitled *Giray v.
Ulukaya, Euphrates, Inc. and Chobani, Inc*., Index No. 652838/2012 which was
resolved by settlement on or about July 15, 2015 (Dckt. # 602) (the "Giray Lawsuit").

7.      In the Giray Lawsuit, Plaintiff Giray sued Defendants Hamdi Ulukaya
("Ulukaya") and related corporate entities Ulukaya controlled for equity ownership in
the Chobani/Euphrates yogurt and cheese enterprises, respectively.

8.      Giray derived her equity claim arising from her prior marriage to Ulukaya
together with her provision of the start-up investment capital which, among other things,
was acknowledged by Ulukaya in the form of his prior affirmation of Giray's co-
ownership, issuance of promissory notes, and specific written acknowledgment that
Giray was the owner of a minimum of 33 1/3 up to as much as 53% of the shares of
stock of the company Euphrates.  *See, Giray v. Ulukaya, Euphrates, Inc. and Chobani,*

*Inc.*, Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶1-38) (*accord*, Amended Verified Complaint, Dckt. #11, *passim*).

### *Plaintiff's Personal and Professional Relationship With Defendant Giray*

9.     Plaintiff Lebetkin and Giray began a six-year romantic relationship in 2006.

10.    During their personal relationship, Lebetkin learned of Giray's financial investment in what is now called Chobani and equity ownership claims which had been disavowed by Ulukaya and the companies (as described in Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶1- 38)(*accord*, Amended Verified Complaint, Dckt. #11, *passim*).

11.    Lebetkin, formerly a certified public accountant in New York state, chief executive officer of a corporate finance agency, with decades of experience in middle market secured debt financing, is also the son of a well-known lawyer in New York City.

12.    Giray and Lebetkin discussed her legal recourse to recover her fair share of the growing Chobani enterprise. Giray was unable to afford nor identify the proper counsel to represent her and, in fact, Giray had failed in her previous efforts to obtain satisfaction from Ulukaya.

13.    At Giray's request, Lebetkin began to use his professional experience and substantial personal and professional connections to assist Giray in her recovery efforts against Ulukaya.

14.    In consultation with Lebetkin, Giray began to contemplate a lawsuit with respect to her claims against Ulukaya and Chobani in approximately May 2012 and promised Lebetkin that if he were to work on her behalf to analyze Giray's equity claims, to build,

assess the value and support the lawsuit, including the selection of appropriate legal counsel, Lebetkin would be compensated for his professional services.

15.     It was clear that Giray had limited resources and that the selected attorneys would have to be retained on a reasonable contingent fee basis and that Lebetkin could only be compensated with some percentage of Giray's ultimate recovery against Ulukaya and Chobani.

16.     In return for her promise, Lebetkin provided, and Giray accepted and availed herself of Lebetkin's business acumen, professional contacts, professional expertise, and past legal claims experience, which including several filings and prosecutions of commercial litigation as a party as well as the negotiation of settlements of same from a business and financial perspective.

17.     Using Lebetkin's non-lawyer professional skills as set forth above, Giray and Lebetkin began to work on the proposed Giray Lawsuit, including meetings with New York law firms which Lebetkin knew.

18.     In June 2012, Lebetkin contacted attorney Defendant, Lewis Sassoon, to discuss Giray's claims and the anticipated Giray Lawsuit.

### *Plaintiff's Personal and Professional Relationship With Defendant Sassoon*

19.     Lewis Sassoon had been a close personal friend of Lebetkin's for more than 10 years, and the two men had worked together on many varied business transactions and litigations together. Lebetkin was a valuable and productive associate/friend to Lewis Sassoon.

20.     During their relationship Lebetkin learned that Lewis Sassoon had obtained a Fifteen Million Dollar ($15,000,000) settlement with regard to the Legal Seafoods chain litigation. There Sassoon had represented Legal Seafoods on a contingency basis and

earned $5,000,000 in legal fees as a result.

21.    Lebetkin foresaw that because Chobani/Ulukaya possessed great wealth that they could and would attempt to overwhelm many under-resourced plaintiff's attorneys/firms and this was a prospect that the experienced Lebetkin sought to avoid when sourcing litigation counsel such as Sassoon and Sassoon & Cymrot, LLP for Giray.

22.    Because of Sassoon's and Lebetkin's   10-year professional and personal relationship, and because the two professionals had worked successfully together on many varied business transactions and litigations together, Lebetkin viewed Sassoon as a trusted legal professional who would protect Lebetkin while working diligently for both Lebetkin and any litigation client whom Lebetkin introduced to Sassoon and his law firm, Sassoon & Cymrot, LLP.

23.    In passing to Sassoon the duty of constructing a legal team for Giray's claims against Ulukaya/Chobani and, thus necessarily, the duty of obtaining the derivative earnings Lebetkin stood to gain working as the litigation consultant for Giray and her Legal Team, Lebetkin reasonably placed his trust and confidence in Sassoon and Sassoon & Cymrot, LLP as attorneys.

24.    Lebetkin not only reasonably expected Sassoon and Sassoon & Cymrot, LLP to represent and protect Lebetkin's interests as a consultant to Giray and the Giray Legal Team, but Sassoon and Sassoon & Cymrot, LLP did in fact work for Lebetkin July 2012 in the drafting and construction of Lebetkin's consulting agreement ostensibly to protect Plaintiff's interests.

25.    Lebetkin trusted and relied upon Sassoon and Sassoon & Cymrot, LLP based upon their past successes and historic relationship.  In particular, Lebetkin relied upon the professional legal advice and counsel given to him by Sassoon and Sassoon & Cymrot, LLP in the developing litigation which Lebetkin was structuring for Giray and in the

contracting of the consulting relationship between Lebetkin and Giray.

26.    Sassoon and Sassoon & Cymrot, LLP drafted the consulting agreement and reviewed it independently with Lebetkin as Lebetkin's counsel.

27.    Sassoon and Sassoon & Cymrot, LLP specifically recommended that the consulting agreement be interminable (be perpetual for the life of the Giray Lawsuit) and have no clauses allowing for unilateral termination by Giray.

28.    One of the reasons for Sassoon's and Sassoon & Cymrot, LLP's counsel against unilateral termination was the fact that Lebetkin disclosed to Sassoon and Sassoon & Cymrot, LLP that the romantic relationship between Giray and Lebetkin might not survive intact.

29.    Another reason for Sassoon's and Sassoon & Cymrot, LLP's counsel against Giray's ability to unilaterally terminate Lebetkin was because Sassoon would not be on the case day to day given his primary office location was in Boston and therefore, Lebetkin should also not be in a position of working solely for the Giray Legal Team and subject to the Legal Team's possible termination where, Lebetkin's consulting services included the responsibility to oversee the New York component of the Giray Legal Team's activities.

30.    Lebetkin, as a result of his history with Sassoon and Sassoon & Cymrot, LLP, and because of Sassoon's and Sassoon & Cymrot, LLP's counsel and representation of Lebetkin as described above, had a reasonable expectation of representation by Sassoon and Sassoon & Cymrot, LLP and in fact received such representation when contracting with Giray.

31.    During this period and thereafter, in relation to Sassoon and Sassoon & Cymrot, LLP, Lebetkin was in a position of vulnerability and Sassoon and his firm, Sassoon & Cymrot, LLP, were empowered over Lebetkin after Sassoon and Sassoon & Cymrot, LLP

accepted their roles as the leaders of the Giray Legal Team and protector of Lebetkin's derivative consulting fees.

32.     Once those roles were accepted by Sassoon and his firm, Sassoon & Cymrot, LLP, and after Giray engaged Sassoon and his firm, Sassoon & Cymrot, LLP, Lebetkin was prevented from effectively protecting himself from the misconduct of the Defendants as is described more fully below.

### *Sassoon Brings In The Rest of The Giray Legal Team*

33.     In June 2012, nearly immediately after Lebetkin approached his long-time legal colleague Lewis Sassoon with the Giray's putative lawsuit against Chobani, Lewis Sassoon introduced Lebetkin and Giray to attorneys  Richard B. Feldman ("Feldman"), Michael H. Smith ("Smith") and Stephen J. Sassoon ("Stephen Sassoon")(Lewis Sassoon's son), and the firm of Rosenberg Feldman Smith, LLP ("Rosenberg Feldman"), in order that those attorneys and Lewis Sassoon and Sassoon & Cymrot, LLP would all be formally retained by Giray (thus forming the "Giray Legal Team").

34.     From the dates June 1, 2012 through August 14, 2012, it was specifically discussed and agreed on several occasions between Defendant Sassoon and the other members of the Giray Legal Team, on one side, and Defendant Giray and Lebetkin as the putative client and her litigation/valuation consultant, respectively, on the other side,  that the Giray Legal Team would necessarily require and rely upon Mr. Lebetkin's consultation services in order to successfully litigate Giray's claims.

35.     In particular, it was discussed and agreed between them that the Giray Legal Team would produce legal pleadings and argument based particularly upon Lebetkin's professional valuation of the Chobani parties' business from which Giray would be seeking an equitable share.

36.    In short, Lebetkin acted as both consultant to Giray and as a litigation expert to the Giray Legal Team, including Defendants Sassoon and Sassoon & Cymrot, LLP when Lebetkin performed his valuation assessments and other consulting work.  As a result, neither Sassoon and Sassoon & Cymrot, LLP nor the other attorney members of the Giray Legal Team hired another expert before the Giray Lawsuit was settled in July 2015.

37.    It is indisputable that Defendants Sassoon and Sassoon & Cymrot, LLP were the attorneys of record in light of the fact that when the Complaint and Amended Complaint in the Giray Lawsuit was filed in the Supreme Court for the State of New York, New York County,  Sassoon and Sassoon & Cymrot, LLP were identified as Giray's attorneys of record.  **Exhibit A**, p. 1, initial paragraph, p. 12, closing salutation;  **Exhibit B**, p. 1, initial paragraph, p. 12, closing salutation.

### *Lebetkin's Consulting Contract and Giray's Guarantee of a Fee Cap*

38.    During the initial consultations with the Sassoon Defendants and the Rosenberg Feldman attorneys, Lebetkin negotiated for Giray in the exercise of his professional advice and counsel, a contingency fee basis for retaining the Giray Legal Team.

39.    The Sassoon Defendants and the Rosenberg Feldman attorneys agreed to a contingent fee and further agreed to a cap on those fees at $10 Million Dollars, no greater.

40.    In addition to the $10 Million Fee Cap, the Sassoon Defendants and the Rosenberg Feldman attorneys further agreed that the contingent legal fee to be derived by the Giray Legal Team should be reduced to a flat thirty percent (30%) as opposed to the more standard thirty-three and one-third percent (33 and 1/3%) normally insisted upon by New York attorneys.

41.    This reduction to a flat thirty percent (30%) contingent fee, capped at $10 Million Dollars, was made in direct consideration to Giray's obligation to pay Lebetkin a three

percent (3%) litigation consultant's fee.

42.     In light of the work already performed and to be performed in the future by Lebetkin for Giray in the prospective Giray Lawsuit and understanding that Giray's and Lebetkin's romantic relationship might not last forever, Lebetkin and Giray then entered into a formal written contract drafted and presented by Lewis Sassoon, a Consulting Agreement, which was executed by both Giray and Lebetkin dated on or about July 16, 2012 (the "Consulting Agreement")(**Exhibit C**).

43.     Again, Lewis Sassoon remained in charge of the Giray Legal Team and, but for issues involving an improvident attempted termination described below, acted as liaison between Lebetkin and Giray from the time of the engagement of the Giray Legal Team until the Giray Lawsuit was settled on or about July 15, 2015.

44.     Pursuant to the terms of that Consulting Agreement, it was acknowledged that Lebetkin's work included sourcing the Giray Legal Team, securing the essential contingent fee arrangements of the legal team for Giray, thereafter providing Giray and her attorneys and advisors with the services detailed in the Consulting Agreement and, as important and his financial and market analysis skills, to manage the lawyers because of Giray's distrust of lawyers generally.

45.     The Consulting Agreement set forth that Lebetkin would provide Giray, her attorneys and experts/advisors the following services (collectively the "Services"):

> Consultant agrees to perform and complete services for; business consultation, review of business records, and working with attorneys and accountants, all in relation to a potential law suit (including settlement and negotiation talks) in connection with establishing Giray's ownership interest ……, together with possible claims of breach of fiduciary duty …. ("Law Suit"). Consultant and Giray may amend the scope of work in writing from time to time in accordance with the terms set forth herein (the "Services") and mutually agreed upon by Giray and Consultant.

46.     Lebetkin did in fact fully perform and deliver all the Services contemplated

under the Consulting Agreement, including managing the Giray Legal Team, as well as other critical nondelineated Services beyond the written scope of work set forth in the Agreement. As Consultant to Giray and the Giray Legal Team, Lebetkin performed the following work:

A.      Review and analysis of relevant and historic business records and business loan applications upon which the Ulukaya/Chobani Defendants' businesses were built, particularly, UCC 1 filings and the interrelationships between Euphrates and Chobani (a/k/a Agri-Farms) and the cross-collateralization of Euphrates to support the financing required for Chobani under SBA regulations;

B.      Development of financial analyses and valuations critical to assessing the value of the Ulukaya/Chobani Defendants' business to which Giray claimed title;

C.      Development of financial analyses and valuations critical to assessing the future value and potential public market offering of the Ulukaya/Chobani Defendants' business to which Giray claimed title;

D.      Structuring of various settlement proposals based upon Lebetkin's financial analyses and public market valuations assessing the value and future of the Ulukaya/Chobani Defendants' business;

E.      Developing various strategic arguments and structures related to Giray's claims and based upon the historic business records of the Defendants in the Lawsuit;

F.      Managing the relationships between Giray and the Giray Legal Team and explaining the basis for Giray's equity claims for the Giray Lawsuit (Lebetkin's professional expertise as a corporate finance

consultant was relied upon heavily by Giray and the Giray Legal Team); and

G.    After certain missteps by the Giray Legal Team and potential jeopardy to the Giray Lawsuit resulting from the Legal Team's attempted use of perjured testimony and evidence adduced from witness/co-Defendant, Adile Batuk, Lebetkin's direct intervention with the primary defense counsel for the Ulukaya/Chobani Defendants and the substantial assistance/facilitation of the ultimate settlement reached between the parties.

47.    Under the terms of the Consulting Agreement, Lebetkin was to receive three percent (3%) of any gross recovery Giray received in any form the Giray Lawsuit, whether by trial, settlement or otherwise (the "Consulting Fees").

48.    "Recovery" is defined in the Consulting Agreement as "any and all monies, property, benefits, shares of stock, membership interest in limited liability companies or other consideration in whatever form received by Giray *directly or indirectly* from Ulukaya, relating to or concerning the interest or potential interest in Euphrates, Inc. and Agro-Farma, Inc., n/k/a Chobani, Inc." (emphasis added).

49.    As mentioned above, Defendants Sassoon and Sassoon & Cymrot, LLP, drafted, prepared and presented the Consulting Agreement for Lebetkin to Giray.   Further, Defendants Sassoon and Sassoon & Cymrot, LLP advised Lebetkin regarding the desirability of a perpetual contract with Giray lasting the life of the litigation.

50.    Attorney Feldman, for the Giray Legal Team, reviewed the Consulting Agreement prior to its execution and acquiesced to its terms.

51.    Defendant Lewis Sassoon counseled Lebetkin regarding the terms of the Consulting Agreement on behalf of Lebetkin and assured Lebetkin that Sassoon and

Sassoon & Cymrot, LLP would be the paymaster of Lebetkin's fees and would protect them from any interference.

52.     At the time the Consulting Agreement was executed in June 2012, Lebetkin and Giray were still involved romantically and maintained that personal relationship.

53.     Pursuant to the Consulting Agreement, Lebetkin negotiated for Giray the engagement letters with Defendants Lewis Sassoon, Sassoon & Cymrot, LLP, Feldman, Smith, Stephen Sassoon and Rosenberg Feldman and those engagement letters, with a thirty percent flat rate contingent fee, were signed by Giray, Feldman and Sassoon on July 16, 2012, immediately after Lebetkin and Giray signed the Consulting Agreement.

54.     The reduction from the standard one third (33 and 1/3%) by three percent (3%)(rounded) was negotiated by Lewis Sassoon on behalf of his firm and the other Giray Team Members in order that Giray's net recovery would not be less than the total usual ordinary legal fee after paying Lebetkin's consulting fees owed under the Consulting Agreement. Giray consented Sassoon made the offer to Lebetkin, and the Consulting Agreement was then signed by Giray and Lebetkin.

55.     The legal engagement letters with the Giray Legal Team were signed with the *express oral understanding* between the Giray Legal Team and Lebetkin, as the appointed Consultant and manager of relationship between Giray and the Giray Legal Team, that the total legal fees charged to Giray would be capped at $10,000,000 even if trial of the Giray Lawsuit was required. Lebetkin objected to legal fees that on a formulaic basis would exceed $10,000,000  and which would then be egregious and not in the best interest of Giray. Sassoon checked with Feldman and agreed on behalf of the Giray Legal Team.

56.     In providing his Consultant's Services, Lebetkin became intimately familiar with the factual issues and evidence underlying Giray's legal claims against the Defendants in the Giray Lawsuit and assisted in developing specific strategies and

economic analyses which were a substantial factor, if not instrumental, to the successful resolution of the Giray Lawsuit and settlement obtained by Giray in July 2015.

57.    In performing his services under the Consulting Agreement, Lebetkin provided Giray and the Giray Legal Team with extensive business and third-party lending collateral analyses of the relationships between: (a) Ulukaya, Euphrates and Chobani; as well as (b) the United States Small Business Administration ("SBA"), Empire State Business Development Corporation (a licensed economic development corporation under SBA regulations, and Key Bank in connection with the loan made by the SBA to Chobani in or about 2007 ("the SBA loan").

58.    Based upon the research and analysis performed at the request of Giray and in consultation with the Giray Legal Team, Lebetkin valued the original Giray equity claim to be in excess of $500,000,000 and provided that analysis and valuation to the Giray Legal Team, subject to learning more through discovery of Chobani's true value believed to be significantly greater.

59.    According to Lebetkin, the Giray equity claim was valued at a minimum of one third (33%) to a maximum of 53% of the total equity value of the Ulukaya companies' business.

60.    Lebetkin's third-party lending and collateral analyses which were provided by him to the Giray Legal Team were the substantial factor, if not instrumental, to the successful settlement of the Giray Lawsuit in July 2015.

61.    Lebetkin also provided consulting services and analyses which evaluated the commercial and economic relationships between the Defendants in the Giray Lawsuit and which spoke to the claim of breach of fiduciary duty that could be asserted by Giray against Defendant Ulukaya, Chobani's CEO, and these analyses were a substantial factor, if not instrumental, in the Giray Legal Team's ability to draft and fashion the Complaint

in the Giray Lawsuit.

62.     Subsequently, a first draft of the Complaint was prepared by the Giray Legal Team and sent to Lebetkin for review under the terms of the Consulting Agreement in Lebetkin's capacity as manager of Giray's law firm relationship for Lebetkin's review and comments.

63.     Under the Consulting Agreement, Lebetkin urged the Giray Legal Team to include background information relating to the SBA loan that had been applied for and submitted by Giray and Ulukaya on behalf of Chobani in 2007. The Giray Legal Team initially resisted this change but ultimately included the SBA background information in the Complaint in the Giray Lawsuit. *See*, *Giray v. Ulukaya, Euphrates, Inc. and Chobani, Inc.*, Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶27-31)(**Exhibit A**).

64.     The SBA loan application contained affidavits and documents from Giray and Ulukaya that stated that Giray owned one third of Euphrates, Inc. and Chobani. These admissions also served as part of the collateral for a loan used to acquire the Kraft yogurt manufacturing plant in Johnstown, New York, a facility that became the initial principal yogurt manufacturing facility for Chobani. *Id.*

65.     The filed Complaint in the Giray Lawsuit sought: (i) damages for diversion of corporative opportunities and assets and breach of fiduciary duties to Euphrates, Inc.; (ii) imposition of a constructive trust upon either one-third or 53% of the issued and outstanding shares of Euphrates, Inc. and Chobani, Inc.; (iii) specific performance directing that Ulukaya deliver to Giray either one-third or 53% of the issued and outstanding shares of Euphrates, Inc. and Chobani, Inc.; (iv) an accounting of the business and affairs of Euphrates, Inc. and Chobani, Inc.; (v) a preliminary and permanent injunction against certain actions of the defendants contrary to Giray's equity claims; and (vi) damages to her individually arising out of Ulukaya's breach of his fiduciary duties to Giray. *Id.*, *accord*, Amended Verified Complaint, Dckt. #11, *passim*.

*Lebetkin and The Rosenberg Feldman Attorneys*
*Quickly Disagree on Critical Case Issues*

66.     Lebetkin avers that the Giray Lawsuit was initially jeopardized by the missteps of the Giray Legal Team in offering a July 16, 2012 Affidavit from a witness, Adile Batuk ("Batuk"), whose testimony was subsequently claimed by the Chobani parties to have been  suborned perjury.

67.     In 2012, Batuk was a long term and concurrent intimate of Giray's and was fully aware  of Lebetkin's romantic relationship with Giray as well as the prospective Giray Lawsuit and the Consulting Agreement which had been entered into by Giray and Lebetkin.

68.     Soon after the Consulting Agreement was signed, it was discovered by Lebetkin in the performance of his consulting duties that Batuk had offered, or was solicited to offer, and had signed an Affidavit dated July 16, 2012 in support of the Giray equity claims. This false Batuk Affidavit was made part of the  Court record in Giray's case by Giray's Legal Team, in particular Richard Feldman and the Rosenberg Feldman attorneys.

69.     Lebetkin came to discover that the Batuk Affidavit being planned for use in the Giray Lawsuit was incorporating false and misleading statements and was procured by Giray's promise to pay Batuk $3,000,000 from Giray's ultimate recovery in the action (this amount was later increased to 5% of the total recovery received by Giray).

70.     Acting in his role as Consultant, Lebetkin strenuously voiced his objections to the Giray Legal Team on three specific issues: (a) the creation and the use of the above-mentioned false Batuk Affidavit; (b) the omission of the SBA information in the complaint in commencement of the action; and (c) the wrongful statements by Giray and Ulukaya regarding the validity of their 1997 marriage.

71.     Lebetkin urged Giray and the Giray Legal Team to first contact the attorneys for Ulukaya, Euphrates and Chobani and to engage in good faith efforts to negotiate a resolution of Giray's equity claims without the filing of a formal legal complaint.

72.     Lebetkin believed, based upon his analyses and investigation that Ulukaya had been engaged in lengthy discussions with Goldman Sachs with respect to underwriting an initial public offering of securities of Chobani. According to Lebetkin, as he told the Giray Legal Team prior to the filing of the Complaint, there was substantial risk to Ulukaya, Euphrates and Chobani in the litigation, and that Goldman Sachs would be unwilling to underwrite a public offering if the Giray equity claim remained unsettled.

73.     Lebetkin urged Giray to require attorney Feldman to contact Ulukaya's counsel and Goldman Sachs prior to commencement of an action and negotiate a settlement, and to avoid a protracted litigation and unnecessary legal fees to Feldman's and Sassoon's law firms by settling early on.

74.     Privately, Lebetkin expressed to Giray that, in his opinion, Feldman's and Sassoon's law firms might be churning the activity in the case to support an argument to Giray to avoid capping their fees as they had originally agreed.

75.     Likewise, according to Lebetkin, as he told the Giray Legal Team prior to the filing of the Complaint, there was substantial risk to Giray in proceeding with the ill-conceived Batuk Affidavit in the litigation.

76.     The Giray Legal Team, particularly attorney Feldman, ignored Lebetkin's numerous requests to show good faith and filed the first Complaint in the Lawsuit on August 14, 2012, without first attempting to negotiate a settlement with the Defendants.

77.     Like the initial draft of the Complaint, the first Demand for Production of Documents drafted by the Feldman firm attorneys omitted a request for the production of the SBA loan documents, which omission, in Lebetkin's opinion, was highly

prejudicial to the successful presentation of Giray's claims. Feldman took umbrage with Lebetkin's attempts to fulfill his duties at the manager of the Giray Legal Team for the benefit of Giray under his Agreement.

78.     Thereafter, Lebetkin engaged in extremely heated discussions and emails with Feldman and the other Giray Legal Team members regarding the demand for the SBA loan application documents.

79.     Eventually Giray, who agreed with Lebetkin on the critical nature of the SBA loan documents, ordered the Giray Legal Team, particularly, Feldman, to request the SBA loan documents in the Demand for Production of Documents under threat that Giray would immediately seek alternate counsel if the Giray Legal Team did not comply.

80.     In response, the Giray Legal Team did in fact include the requests for the SBA loan in the amended and served Demand for Production of Documents.

81.     Because of Lebetkin's consulting services and his persistent pushing the Giray Legal Team, particularly Richard Feldman, on the SBA issues, ultimately, the Court ordered the Defendants in the Giray Lawsuit to produce the SBA loan application documents to the Giray Legal Team. This Order was a substantial, if not the primary, factor supporting the Giray Legal Team's establishment of Giray's legitimate equity claims in the Giray Lawsuit.

### *Feldman and the Rosenberg Feldman Attorneys Tortiously Interfere With Lebetkin's Contract*

82.     Over the course of August 2012, having been proven incorrect by Consultant Lebetkin, who had been very strident in his communications on the Batuk and SBA issues with the Giray Legal Team, attorney Feldman, on behalf of the Giray Legal Team, began a campaign and conspiracy to interfere with Lebetkin's Consulting Agreement.

FILED: NEW YORK COUNTY CLERK 09/06/2018 03:10 PM
NYSCEF DOC. NO. Case 1:18-cv-08170-DLC   Document 1-1   Filed 09/07/18   Page 20 of 74 NYSCEF: 09/06/2018

INDEX NO. 654425/2018

83.     The dispute between Feldman on one hand and Lebetkin of the other hand culminated with Feldman's August 2012 email communication to Lebetkin threatening Lebetkin with a restraining order if Lebetkin did not cease and desist advising and directing Giray regarding the Giray Legal Team's conduct in the Giray Litigation.

84.     Feldman's clear intent was to remove Lebetkin as manager of the Giray Legal Team, thus diminishing Lebetkin's counsel over Giray's case, to thwart any future disclosure of the attorney misconduct in relation to the false Batuk Affidavit and to abrogate the oral understanding and evidence of a fee cap of $10,000,000 on the Giray Legal Team's potential legal fees.

85.     Feldman at or about that time was informed together with Sassoon about the deterioration of the romantic relationship between Lebetkin and Giray, a deterioration that was propelled in large part by Lebetkin's discovery of the falsity of the Batuk Affidavit and Giray's and Feldman's intent to use it knowingly in the Giray Litigation.

86.     On or about August 25, 2012, Giray and Lebetkin ended their romantic relationship and this fact was immediately known by Feldman and Sassoon, and most probably, all the other Giray Legal Team Members.

87.     Immediately after this knowledge was learned by Feldman, Feldman engaged in tortious communications with Giray which were designed to interfere with the Consulting Agreement between Giray and Lebetkin due solely to Feldman's motivation to be rid of Lebetkin's oversight and to revisit the issue of uncapped contingent fees.

88.     During the month of August 2012, by way of copies of email communications between Lebetkin, Giray and Feldman, Defendant Sassoon was made fully aware of the strategic disputes between Feldman and Lebetkin and of Lebetkin's substantial objections to the Batuk Affidavit and the handing of the SBA information.

89.     Sassoon took no overt action to curtail Feldman in August 2012 but consoled

Lebetkin in his role as counselor and attorney to Lebetkin on the Consulting Agreement and told Lebetkin that he, Sassoon, would protect Lebetkin's contract and fees and that he, Sassoon, "had his (Lebetkin's) back".  Sassoon specifically promised Lebetkin that he, Sassoon, would travel to New York from Boston once a week, would intersect with his son, Stephen J. Sassoon at Feldman's firm, and would make sure the case stayed on track and that Lebetkin would stay informed.

90.     However, despite these assurances by Sassoon, on September 6, 2012, Feldman delivered a purported unilateral termination of the Consulting Agreement signed by Giray and dated September 6, 2012 but which had been solicited from her by Feldman (**Exhibit D**).

91.     The tortious interference initiated by Feldman, was either subsequently tacitly or overtly joined by Lewis Sassoon, and the other Rosenberg Feldman attorneys, and did in fact interfere with Lebetkin's contract with Giray and was timed to take maximum advantage of the fact that Giray and Lebetkin were then having obvious difficulty in their romantic relationship.

92.     Contrary to the ineffective termination notice, in accord with Defendant Sassoon's drafting, the Consulting Agreement was intended to survive for the duration of the Giray Lawsuit and therefore does not contain any provisions permitting a party to terminate the agreement, whether for cause, without cause or for manufactured reasons.

93.     In fact, the Consulting Agreement expressly provides in Section 4 thereof:

> "**Term; Termination**. This Agreement shall begin on the Effective Date and terminate on the close or termination of the Law Suit (the "Term"). Any remedies for breach of this Agreement shall survive any termination or expiration. Notwithstanding termination of this Agreement, the fees due to Consultant hereunder shall be paid according to this Agreement." (Emphasis added.)

94.    The attempt to "terminate" the Consulting Agreement was an improper retaliation by Feldman for Lebetkin's highly vocal concern about the improper conduct of Giray and the Giray Legal Team, and the negative effect that such misconduct would have on the successful resolution of the Giray Lawsuit.

### Sassoon Breaches His Professional, Fiduciary and Contractual Duties to Lebetkin

95.    Upon realizing that Feldman and the Rosenberg Feldman attorneys were tortiously interfering with the Consulting Agreement and inducing Giray to breach the contract with Lebetkin, Sassoon and Sassoon & Cymrot, LLP nevertheless breached their professional, fiduciary and contractual duties to Lebetkin to protect his contract from the unilateral attempt to terminate and tortious interference by Feldman and the Rosenberg Feldman attorneys.

96.    Despite making private assurances to Lebetkin that they would protect his contract and fees, neither Sassoon and nor Sassoon & Cymrot, LLP interceded to protect Lebetkin's position *vis-à-vis* Giray or Feldman and his law firm despite their having accepted, created and fostered a professional duty as Lebetkin's attorney representatives to do so.

97.    Neither Sassoon and nor Sassoon & Cymrot, LLP interceded to protect Lebetkin's position *vis-à-vis* Giray or Feldman and his law firm despite their having accepted, created and fostered a fiduciary duty as Lebetkin's representatives to do so where Sassoon and Sassoon & Cymrot, LLP. New York law held *de facto* control and dominance over Lebetkin and where Lebetkin heretofore reposed with Sassoon and Sassoon & Cymrot, LLP a high level of confidence and reliance, allowing Sassoon and

Sassoon & Cymrot, LLP to exercise control and dominance over Lebetkin and the Consulting Agreement.

### *Lebetkin Performs Despite Feldman's Tortious Interference*

98.    From 2012 through the beginning of 2014, despite some settlement discussions between the parties, the Giray Legal Team and the Chobani defense attorneys were deadlocked on the issue with each having drawn lines in the sand which were hopelessly irreversible. In fact, the parties were deadlocked on settlement in July 2014.

99.    Despite the Giray Legal Team's ineffective termination notice, Lebetkin proved after July 2014 to be instrumental in bringing the parties together by focusing their attention on litigation reality and potential publication of information through the already active and media attention. As a direct and proximate result of Lebetkin's work for Giray, the two sides reestablished settlement negotiations and the case resolved by settlement on July 15, 2015.

100.    By March 2015, the Defendants' defense counsel sought, as Lebetkin had predicted, to take advantage of the Batuk affidavit and to discredit Giray and the Giray Legal Team thereby substantially devaluing Giray's otherwise legitimate and valuable equity claims. *See*, Supreme Court  Dckt. ##591-599.

101.    Because of Lebetkin's loyal and steadfast performance of his work and services under the Consulting Agreement, among other non-delineated tasks, Lebetkin was a substantial factor, if not instrumental, in the successful conclusion of the Giray Lawsuit in July 2015.

102.    Lebetkin fully performed his obligations under the Consulting Agreement.

103.    Lebetkin has no further obligations to perform under the Consulting Agreement beyond the services defined therein in writing.

104.    Upon information and belief, the Giray Lawsuit Defendants offered and Giray has accepted a two-part settlement package valued in several millions of dollars, but which may or may not have been less than the true one third to 53% value of Chobani. A portion of this settlement package was not disclosed to the Court and/or to Lebetkin, and therefore the true value of the gross settlement numbers is unknown to Lebetkin and have been hidden from the Court, him and the public.

105.    Lebetkin is entitled to receive his Consulting Fees in the amounts calculated from Giray's true and actual settlement with the Defendants in the Giray Litigation, pursuant to the Settlement Agreement which is filed under seal with the court and/or pursuant to any other arrangement made between Giray and the Chobani Defendants (or their direct or indirect assigns) which has not been recorded pursuant to the Settlement Agreement which is filed under seal with the court.

106.    Further, pursuant to the terms of the Consulting Agreement, Lebetkin is entitled to three percent (3%) of the gross recovery obtained by Giray from the Defendants (or any of their direct or indirect assigns), whether in the form of cash or other consideration, current or deferred, and whether the consideration is reported or not reported in Settlement Agreement which is filed under seal with the New York Supreme Court.

107.    The Consulting Fees due to Lebetkin are a minimum of three percent (3%) of Giray's settlement amounts plus his share of the lost profits, dependent upon the true value of Giray's settlement, which he would have received but for the wrongful and illegal actions undertaken by Giray and the Giray Legal Team in the Giray Lawsuit.

108.    As set forth below, Lebetkin further pleads that Plaintiff Lebetkin has also been damaged due to the tortious misconduct of the Defendants and Defendant's agents, by being precluded from earning his full Consulting Fees of three percent (3%) of the legitimate and true one-third equity interest in Chobani that Giray originally claimed

which Giray clearly owned as set forth in her pleadings in the Giray Lawsuit.

109.     By virtue of Giray's and the other Defendants' wrongful and illegal actions and torts, as pled further below, Lebetkin was derivatively deprived of his Consulting Fees causing Lebetkin a substantial amount of lost profits pursuant to his entitlement under the Consulting Agreement, namely, the fair market value of one percent (1%) of the current market value of Chobani (which is three percent (3%) of the one-third interest in Chobani).

110.    The Defendant attorneys were the Defendant Giray's agent when acting in furtherance of the Giray Lawsuit or in relation to the Lebetkin Consulting Fee Agreement.

111.    Upon information and belief, Lewis Sassoon remained in charge of the Giray Legal Team from the time of the engagement of the Giray Legal Team until the Giray Lawsuit was settled in July 2015.

112.    Lebetkin has made repeated demands for payment of the Consulting Fees as set forth under the Consulting Agreement but neither Giray nor the Giray Legal Team have honored the Consulting Agreement and paid the Fees now due nor planned to pay the Fees that will become due in the future.

113.    Despite the improper and malicious breach of contract by Giray, Giray, who accepted Lebetkin's professional consulting services in furtherance of the successful settlement of the Giray Lawsuit, and who will be paid substantial monies as a result, has or will receive the value of Lebetkin's work.  The reasonable value of that work can only be measured as a percentage of the Giray settlement and 3% is a reasonable percentage.

114.    Despite their apparent overt or tacit support of the improper and malicious breach of contract by Giray, the Giray Legal Team accepted Lebetkin's professional consulting services in furtherance of the successful settlement of the Giray Lawsuit and they will be

paid substantial attorneys' fees as a result. The reasonable value of Lebetkin's work can only be measured as a percentage of the Giray settlement and 3% is a reasonable percentage.

115. Plaintiff's discovery of the acts as well as the motives behind the Defendants acts did not occur until the mediation of the dispute and presentation of certain defenses by attorney Feldman in November 2016.

116. Further, the Chobani settlement from which Ms. Giray derives her funds, and upon which she was obligated to pay Lebetkin his consulting fees, is upon information and belief, still being paid over time. Accordingly, the breaches of contracts and torts described in this Amended Complaint are of a continuing nature and discovery of the undisclosed settlement payments will be necessary for Plaintiff to fully discovery the nature and time of each breach and tort.

### FIRST CAUSE OF ACTION
**Breach of Contract**

#### *Defendant Giray*

117. Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

118. Plaintiff and Defendant Giray entered into a legally binding Consulting Agreement.

119. In consideration of the Consulting Fees to be paid, Lebetkin provided the Giray and her Legal Team with the agreed Services pursuant to the Consulting Agreement.

120. Giray has failed and refused to pay the Consulting Fees for the Services as required by the Consulting Agreement.

121. Giray has breached the Consulting Agreement without justification.

122. As a result of Giray's breach, Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Unjust Enrichment

### *Defendants Giray and Lewis Sassoon*
### *and Sassoon & Cymrot, LLP*

123.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

124.    Plaintiff and Defendant Giray entered into an express legally binding Consulting Agreement.

125.    Giray received the benefit and value of Lebetkin's consulting work and successfully concluded the Giray Lawsuit as a result.

126.    At the same time, the attorney Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, were the obvious and notorious intended third-party beneficiaries of the Consulting Agreement and likewise have derived the value of Lebetkin's consulting services as they would have had the payment of Lebetkin not have been constructed by Sassoon to be a percentage of Giray's settlement obtained from the Chobani parties.

127.    It would be inequitable to allow the Defendants, Giray, Sassoon and Sassoon & Cymrot, LLP to receive the value of Lebetkin's work without compensating him.

128.    The reasonable value of Lebetkin's work can only be measured as a percentage of the Giray settlement and 3% is a reasonable percentage.

129.    Denying Plaintiff Lebetkin recovery for the value of his services provided to the Defendants Giray, Sassoon and Sassoon & Cymrot, LLP  would be inequitable and unjust.

130.    The value of the unjust enrichment to Defendants Lewis Sassoon and Sassoon & Cymrot, LLP, shall establish Plaintiff Lebetkin's damages which shall be proven at trial.

### THIRD CAUSE OF ACTION
**Breach of Fiduciary Duty**

#### *Defendant Giray*

131.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

132.    Plaintiff Lebetkin and Defendant Giray entered into a legally binding Consulting Agreement which could not be terminated at will and which, in the provision of the Consulting Services, Lebetkin owed contractual duties to Giray.

133.    Defendant Giray also had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by her attorneys, the Giray Legal Team as headed, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP.

134.    Defendant Giray, because of her contract privity as a principal and client of the Defendant agents/attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, had a relationship with the Plaintiff Lebetkin relevant to Giray's duty to protect Lebetkin's Consulting Fees which was grounded in a higher level of trust than normally present in the marketplace involving arm's length business transactions.

135.    Giray engaged in misconduct when, with Giray's full knowledge, Giray allowed her agents/attorneys, the Giray Legal Team as headed, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, to attempt to terminate the Consulting Agreement with Lebetkin which was interminable by its terms.

136.    Giray knew and understood that the attempted termination was invalid and was undertaken solely because the Giray Legal Team, spearheaded by attorney Feldman, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, had engaged in malicious, fraudulent and bad faith retaliation because Lebetkin had

openly challenged Feldman concerning his misconduct and missteps with the suborned affidavit of witness Batuk and the failed discovery and use of the SBA and immigration background evidence.

137.    Giray knew that the Giray Legal Team as headed, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, were attempting to quiet Lebetkin in order to avoid potential penalties against them in relation to Batuk's affidavit, the SBA discovery and/or disclosure of how these missteps and mistakes were devaluing the Giray claims.

138.    Despite this knowledge, Giray engaged in misconduct to avoid payment of the Plaintiff's Consulting Fees and breached her independent fiduciary duty to Plaintiff.

139.    As a direct result of the Defendant Giray's breach of fiduciary duty to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty

### *Defendants Lewis Sassoon and Sassoon & Cymrot, LLP*

140.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

141.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by other persons associated with the Giray Legal Team including the Rosenberg Feldman attorneys and Defendant Giray.

142.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, as the negotiators, drafters, architects of the Consulting Agreement, and as the attorneys responsible for working for Plaintiff Lebetkin and whom were envisioned by Lebetkin to act in the future

FILED: NEW YORK COUNTY CLERK 09/06/2018 03:10 PM
NYSCEF DOC. NO.    Case 1:18-cv-08170-DLC   Document 1-1   Filed 09/07/18   Page 30 of 74

INDEX NO. 654425/2018
NYSCEF: 09/06/2018

as the paymasters of any consultant's fees due to Plaintiff from a gross recovery made on behalf of Giray, also accepted and fostered an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by other persons associated with the Giray Legal Team including the Rosenberg Feldman attorneys and Defendant Giray.

143.    Lebetkin's historic 10-year professional association with Lewis Sassoon and Sassoon's law firm and the introduction by Lebetkin to the Giray Lawsuit against Chobani/Ulukaya were not simply common place arm's length commercial transactions, but rather, Sassoon and his firm were held in a position of confidence and trust by Lebetkin sufficient that a fiduciary relationship arose given the extraordinary circumstances of the Giray Lawsuit referral where Sassoon and his firm were skilled attorneys, had actually represented Lebetkin in the negotiation of the Consulting Agreement with Giray and likewise specifically advised Lebetkin to avoid a unilateral right of termination by Giray in the Agreement given the uncertain future of the romantic relationship between Lebetkin and Giray.

144.    Defendants Lewis Sassoon and Sassoon & Cymrot, LLP, as the head of the Giray Legal Team, had a relationship with the Plaintiff Lebetkin relevant to their duty to protect Lebetkin's Consulting Fees which was grounded in a higher level of trust than normally present in the marketplace involving arm's length common place business transactions.

145.    Upon learning of the attempt by Feldman and the Rosenberg Feldman attorneys to interfere with Giray's contract with Lebetkin, and/or Giray's otherwise illegitimate attempt to unilaterally terminate the contract,  Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, took no steps to protect their client's, Lebetkin's, interests, failed to fulfill their professional and fiduciary duty to protect Lebetkin's contractual rights and allowed

Feldman and the Rosenberg Feldman engaged in interference with Lebetkin's contract, with full knowledge of their professional and fiduciary duties to Lebetkin.

146.    As a direct result of the Defendants, Lewis Sassoon's and Sassoon & Cymrot, LLP's, breach of their professional and fiduciary duties to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**Professional Malpractice**

***Defendants Lewis Sassoon and Sassoon & Cymrot, LLP***

147.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

148.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP entered into a professional attorney – client relationship with Lebetkin in relation to Lebetkin's Consulting Agreement with Giray.

149.    Upon Giray's attempt to terminate the Agreement and/or Feldman's interference with it, Sassoon and Sassoon & Cymrot, LLP had a professional duty to protect Lebetkin and ensure performance of the contract at the time they realized a potential breach and/or tortious interference by their associates, Feldman and the Rosenberg Feldman attorneys.

150.    Lebetkin, as a result of his history with Sassoon and Sassoon & Cymrot, LLP, and because of Sassoon's and Sassoon & Cymrot, LLP's counsel and representation of Lebetkin as described above, had a reasonable expectation of representation by Sassoon and Sassoon & Cymrot, LLP and in fact received such representation when contracting with Giray.

151.    Lewis Sassoon and Sassoon & Cymrot, LLP possessed that degree of skill and acumen required of them as counsel to Lebetkin and in the exercise of their professional duty to Lebetkin should have and could have protected Lebetkin's contract from improper

breach and protected payment of Lebetkin's fees from Giray's settlement proceeds.

152.     Lewis Sassoon and Sassoon & Cymrot, LLP failed to exercise their professional duties as attorneys to Lebetkin in relation to the Consulting Agreement.

153.     But for Lewis Sassoon's and Sassoon & Cymrot, LLP's negligence and failure to perform their duties to Lebetkin, Lebetkin's contract would not have been breached by Giray and Lebetkin's fees under the Agreement would have been protected.

154.     Lebetkin has been damaged as a result of Lewis Sassoon's and Sassoon & Cymrot, LLP's professional negligence and malpractice.

### SIXTH  CAUSE OF ACTION
**Tortious Interference With Existing Contract
And Prospective Economic Benefit**

***Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP***

155.     Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

156.     Alternatively, Defendants Lewis Sassoon and Sassoon & Cymrot, LLP, in late August 2012 joined with Feldman and the Rosenberg Feldman attorneys to conspire and tortiously interfere with the Giray-Lebetkin Consulting Agreement.

157.     Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team knew of: (1) the existence of the Consulting Agreement;

(1)     that the Agreement was valid, enforceable and could not be terminated at will; (3) that Lebetkin fully performed his obligations in accord with the terms of the Agreement; and (4) that the personal relationship between Giray and Lebetkin had eroded or was then eroding.

158.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP,  likewise knew (1) the existence of a contract between plaintiff and Giray; (2) defendant's knowledge of the contract; and (3) of Feldman's *intentional inducement* of Giray to breach or otherwise render performance impossible.

159.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, joined the conspiracy initiated by Feldman to promote the intentionally procured breach of the Consulting Agreement by Giray and did so by engaging in one or more overt acts in furtherance of a conspiracy.

160.    Defendant Giray did in fact breach the Consulting Agreement as a direct result of the Defendant attorneys', joinder of Feldman's plan to induce the breach Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team engaged in tortious interference by such joinder.

161.    As a direct result of the Defendant attorneys', Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, tortious interference with Giray's Consulting Agreement with Plaintiff Lebetkin, Plaintiff has been damaged.

### SEVENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty

#### *Defendants Lewis Sassoon and Sassoon & Cymrot, LLP*

162.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

163.    Defendant Giray had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution.

164.     Each of the Defendant attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, knew of: (1) the fiduciary duty of Giray running to Lebetkin on the issue of protection of Lebetkin's Consulting Fees; (2) the existence of the Consulting Agreement; (3) that the Agreement was valid, enforceable and could not be terminated at will; (4) that Lebetkin fully performed his obligations in accord with the terms of the Agreement; and (5) that the personal relationship between Giray and Lebetkin had eroded or was then eroding.

165.     Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, as the negotiators, drafters, architects of the Consulting Agreement, and as the attorneys responsible for working with Plaintiff Lebetkin and for acting as the paymasters of any fees due to Plaintiff from a gross recovery made on behalf of Giray, knew of Giray's fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution.

166.     Defendants Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, and as attorneys for Defendant Giray, substantially assisted Giray in breaching her fiduciary duty to the Plaintiff Lebetkin.

167.     Defendant agents/attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, engaged in aiding and abetting misconduct.

168.     Defendant agents/attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, were the substantial factor in Giray's breach of fiduciary duty to Lebetkin.

169.     Because of their bad faith motives and malice, the aiding and abetting misconduct of the Defendant attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, heading,

overseeing and managing the Giray Legal Team, was egregious and shocks the conscience of normal persons.

170.    As a direct result of the Defendant attorneys', Lewis Sassoon and Sassoon & Cymrot, LLP, aiding and abetting Giray's breach of fiduciary duty to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Quantum Meruit

### *Defendants Giray, Lewis Sassoon and Sassoon & Cymrot, LLP*

171.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

172.    Plaintiff Lebetkin provided litigation consulting services pursuant to the terms of the Consulting Agreement to Defendants Giray and Defendant attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, and Plaintiff Lebetkin spent substantial time and used his expertise in doing so.

173.    Defendants owe Lebetkin for the reasonable value of his work.

174.    Defendants have failed and refused to pay for these valuable services.

175.    Plaintiff Lebetkin is entitled to be paid the fair market value of his services rendered pursuant to the Consulting Agreement.

176.    The reasonable value of Lebetkin's services is three (3%) of the total settlement received and to be received by Giray from the Chobani parties.

## NINTH CAUSE OF ACTION
### Prima Facie Tort

### *Defendant Giray*

177.    Plaintiff incorporates each and every allegation contained in the preceding

Case 1:18-cv-08170-DLC   Document 1-1   Filed 09/07/18   Page 36 of 74

paragraphs of this Complaint as though fully set forth here at length.

178.    Plaintiff Lebetkin provided litigation consulting services pursuant to the terms of the Consulting Agreement to Defendant Giray and Defendant attorneys, Lewis Sassoon and Sassoon & Cymrot, LLP.

179.    Giray  determined to engage in conduct to breach the Consulting Agreement with Lebetkin solely due to his ending of their romantic relationship in August 2012.

180.    Giray engaged thereafter in:  (1) the intentional infliction of harm, (2) which resulted in special damages to Lebetkin measured by the loss of his fees, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful had the Consulting Agreement allowed for termination without cause.

181.    Giray was solely driven by her  malevolence towards Lebetkin which was is the sole motive for Giray's otherwise lawful act and Giray had no other motive other than to injure Lebetkin.

182.    Giray has committed the tort of Prima Facie Tort as a result.

183.    Lebetkin was damaged thereby.


## JURY DEMAND

184.    Plaintiff demands a trial by jury on all issues presented in this complaint.


**WHEREFORE**, Plaintiff Lebetkin demands judgment against Defendants on the FIRST through NINTH CAUSES OF ACTION for:

    (A)    Compensatory damages in an amount to be determined at a trial;

    (B)    Pre-and post-judgment interest;

    (C)    Punitive damages;

    (D)    Reasonable attorneys' fees;

(E)      Costs and disbursements; and

(F)      Such other and further relief as the Court deems just and

equitable.

Dated: September 3, 2018

**VERNER SIMON**

By:      _/S/ Paul W. Verner_
     Paul W. Verner, Esq.
     *Attorneys for Plaintiff*
     30 Wall Street, 8th Floor
     New York, NY 10005
     (212) 502-5500
     pwverner@vernerlaw.com

# EXHIBIT "A"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X
AYSE GIRAY, individually and on behalf of
EUPHRATES, INC.

Plaintiff,                                    Index No.:

**VERIFIED COMPLAINT**

-against-

HAMDI ULUKAYA, EUPHRATES, INC. and
CHOBANI, INC.,

Defendants.
----------------------------------------------------------------X

Plaintiff Ayse Giray, by and through her attorneys, Rosenberg Feldman Smith, LLP and

Sassoon & Cymrot, LLP, as and for her Verified Complaint, individually and on behalf of

Euphrates, Inc., alleges as follows:

1.     Plaintiff Ayse Giray ("Giray" or "Plaintiff") is an individual residing in the City,

County and State of New York where she is a doctor licensed to practice medicine since 1985,

and is the owner of fifty-three percent (53%) of the shares of stock of Euphrates, Inc.

2.     Upon information and belief, at all times material, defendant Hamdi Ulukaya

("Ulukaya") is an individual residing in the City, County and State of New York and was and is

the president and chief executive officer of defendants Euphrates, Inc. and Chobani, Inc.

3.     Upon information and belief, at all times material, defendant Euphrates, Inc.

("Euphrates") was and is a domestic corporation formed under and by virtue of the laws of the

State of New York with its principal place of business at 230 Enterprise Road, Johnstown, New

York 12095.

1

4.      Upon information and belief, at all times material, defendant Chobani, Inc. ("Chobani"), formerly known as Agro-Farma, Inc. ("Agro-Farma"), was and is a domestic corporation formed under and by virtue of the laws of the State of New York with its principal place of business at 147 State Highway 320, Norwich, New York 13815.

5.      In 1997 Plaintiff and Ulukaya, both of whom are Turkish, met in Manhattan and in the summer of 1997 were married in the State of New York.

6.      Ulukaya, whose family operated a dairy farm in Turkey, told Plaintiff of his desire to start a cheese and yogurt business in the United States, but that he did not have the finances to start the venture.

7.      At the request of Ulukaya, Plaintiff agreed to help finance the venture and to become a co-owner in the business.

8.      Accordingly, Plaintiff transferred money to Ulukaya in various amounts over time to be used to start up and develop the business.

9.      On or about September 8, 1997, Plaintiff and Ulukaya formed Euphrates for the purpose of producing and marketing dairy products but which started out primarily producing feta cheese in a factory in Johnstown, New York.

10.     Thereafter, Plaintiff applied for a business loan for Euphrates, but the loan was not approved because the amount sought (determined by Ulukaya) was too great.

11.     Later, the bank approved a loan for a lesser amount for Euphrates. The loan was obtained using Plaintiff's finances.

12.     In exchange for Plaintiff's financing, Ulukaya agreed that Plaintiff would be a co-owner of Euphrates and that he would hold the shares of stock of Euphrates for her benefit.

13.     Upon information and belief, Plaintiff and Ulukaya are the sole owners of all of the issued and outstanding shares of stock of Euphrates.

-2-

14.     Throughout the period 1997-1999, Plaintiff invested various amounts of capital in Euphrates totaling approximately $198,000.00.

15.     Upon information and belief, the $198,000.00 investment was used, *inter alia*, to purchase the machinery and equipment necessary to start up and maintain the production of various products for Euphrates.

16.     On June 7, 1999, Plaintiff and Ulukaya divorced, although they remained close friends and in business thereafter.

17.     In late 2002, Plaintiff and Ulukaya discussed implementing their original concept of a fuller line of dairy products for Euphrates by the manufacture and sale of yogurt as part of Euphrates' business and the need to purchase yogurt making equipment.

18.     In October 2002, Plaintiff made an additional capital contribution to Euphrates in the amount of approximately $200,000.00, which was to facilitate the acquisition of yogurt equipment for Euphrates and to support the existing cheese production.

19.     In addition, throughout 2003, Plaintiff continued to contribute operating capital to Ulukaya in order to sustain Euphrates, which was then having cash-flow problems, by making periodic contributions.

20.     These periodic contributions lasted for around 1 year ending in either 2003 or 2004 and totaled approximately $100,000.00.

21.     On September 19, 2003, Ulukaya delivered to Plaintiff a promissory note in the amount of $100,000.00, a copy of which is annexed hereto as **Exhibit A.**

22.     On September 22, 2003, Ulukaya provided Plaintiff with a written acknowledgment that Plaintiff was the owner of 53% of the shares of stock of Euphrates, a copy of which is annexed hereto as **Exhibit B.**

-3-

23. Though the plan was for the yogurt business to be a component of Euphrates' business and for Euphrates to purchase yogurt equipment for that purpose, Ulukaya (without the knowledge of Plaintiff) became aware of the opportunity to purchase a former Kraft Foods factory in Norwich, New York with which to manufacture yogurt.

24. Upon information and belief, on or about December 1, 2004, and without the knowledge of Plaintiff, Ulukaya formed a separate company Agro-Farma, to purchase the former Kraft Foods factory and to produce the yogurt line as a business separate and apart from Euphrates.

25. Without the knowledge of Plaintiff, Ulukaya used the business operations, assets and property of Euphrates for Agro-Farma to acquire the Kraft Foods yogurt factory in August 2005.

26. Upon information and belief, and without the knowledge of Plaintiff, Ulukaya also used a portion of Plaintiff's October 2002 investment ($200,000.00) to acquire the Kraft Foods factory.

27. Upon information and belief, in 2005, Ulukaya applied for and obtained a Small Business Administration ("SBA") loan to acquire the Kraft Foods yogurt factory, using and secured by a mortgage on Euphrates' property and manufacturing plant and a security interest in its inventory. In the SBA loan application, Ulukaya failed to disclose Plaintiff's ownership interest in Euphrates.

28. As part of the SBA loan to acquire the Kraft Foods factory, on or about September 1, 2005, Key Bank, N.A. took a security interest in inventory of Euphrates and Agro-Farma. Annexed hereto as **Exhibit C** is a copy of the UCC financing statements.

29. Upon information and belief, on or about December 27, 2005, Agro-Farma acquired a yogurt case packing machine and the financing statement filed pursuant to said

-4-

acquisition listed Argo-Farma, Euphrates and the Development Chenango Corporation (formerly known as the Chenango County Area Corporation) as secured parties. Annexed hereto as **Exhibit D** is a copy of the UCC financing statement and amendment.

30. After commencing production, Ulukaya used the sales staff and resources of Euphrates for the business operations of Agro-Farma, which later changed its name to Chobani.

31. In a 2012 article on the SBA's website (www.sba.gov) Ulukaya was quoted as follows: "When I started Euphrates, I always thought yogurt quality could be better. As an entrepreneur, in whatever you do, you need to be aware if your category-what's good, what's bad, where the potential is-and I saw that early on. I knew how to sell cheese to the food service industry but the retail yogurt world was a whole different ballgame." Annexed hereto as **Exhibit E** is a copy of the SBA article.

32. In 2007, Plaintiff became aware that Ulukaya had formed Chobani to acquire the Kraft Foods factory and to produce the new yogurt line, contrary to what was agreed.

33. When confronted, Ulukaya promised Plaintiff that she would have the same ownership interest and receive the same percentage of stock of Chobani as he was holding for her in Euphrates.

34. Upon information and belief, Plaintiff and Ulukaya are the sole owners of all of the issued and outstanding shares of stock of Chobani.

35. In recognition of her ownership interest in Euphrates and Chobani, Ulukaya made payments in 2007 to Plaintiff totaling approximately $290,000.00. Ulukaya told Plaintiff that additional payments would be made when Euphrates and Chobani became more profitable.

36. On several occasions thereafter, Ulukaya verbally acknowledged to Plaintiff and third-parties that he and Plaintiff were "partners" in Euphrates and Chobani.

-5-

37.    By December 2011, Ulukaya had not made any additional payments to Plaintiff. When in December 2011 Plaintiff requested from Ulukaya her share of the profits of Euphrates and Chobani, he refused; instead he offered Plaintiff the cheese business (Euphrates) in exchange for her interest in Chobani, an offer he later rescinded.

38.    In response to Plaintiff's demand, Ulukaya refused to provide to Plaintiff her share of profits or an accounting and instead threatened the lives and health of Plaintiff's family.

## AS AND FOR A FIRST CAUSE OF ACTION
## ON BEHALF OF EUPHRATES
## Diversion of Corporate Opportunities and Assets

39.    Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-38 as if fully set forth herein.

40.    Plaintiff and Ulukaya are the two shareholders in Euphrates where Plaintiff owns a 53% interest.

41.    Plaintiff invested approximately $498,000.00 with Ulukaya, to be used as startup capital for Euphrates and to later help establish a dairy business that included the production and sale of cheese and yogurt.

42.    Ulukaya misappropriated from Euphrates the business opportunity of the yogurt line.

43.    Ulukaya misappropriated the assets and property of Euphrates to acquire the Kraft Foods yogurt factory for Chobani and to start up Chobani.

44.    Ulukaya used the sales staff and resources of Euphrates for the business operations of Chobani.

45.    All of said misappropriations occurred without the knowledge or consent of Plaintiff.

-6-

46. In 2007, Plaintiff learned about the misappropriations after she discovered that Chobani was formed as a separate and distinct entity from Euphrates.

47. As an inducement to Plaintiff to forbear from enforcing her and Euphrates' rights, Ulukaya repeatedly stated to Plaintiff that she had the same ownership interest in Chobani as she did in Euphrates and that Chobani was a part of Euphrates.

48. As a result of the foregoing, Euphrates has been damaged in an amount which can only be ascertained upon an accounting, but is believed to be in excess of $1 billion.

49. Plaintiff has made no effort to secure the initiation of the instant action by the Board of Directors of Euphrates because such effort would be futile in that Euphrates is under the complete control and domination of its sole shareholder of record, Ulukaya.

## AS AND FOR A SECOND CAUSE OF ACTION
## ON BEHALF OF EUPHRATES
## Breach of Fiduciary Duty to Euphrates

50. Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-49 as if fully set forth herein.

51. As an officer, director and shareholder of Euphrates, Ulukaya breached his fiduciary duties to Euphrates by misappropriating the yogurt opportunity and Euphrates' assets.

52. As a result of Ulukaya's breach of fiduciary duty, he has damaged Euphrates in an amount which can only be ascertained upon an accounting but is believed to be in excess of $1 billion.

53. As an inducement to Plaintiff to forbear from enforcing her and Euphrates' rights, Ulukaya repeatedly stated to Plaintiff that she had the same ownership interest in Chobani as she did in Euphrates and that Chobani was a part of Euphrates.

-7-

54.     Plaintiff has made no effort to secure the initiation of the instant action by the Board of Directors of Euphrates because such effort would be futile in that Euphrates is under the complete control and domination of its sole shareholder of record, Ulukaya.

## AS AND FOR A THIRD CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
## Constructive Trust

55.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-54 as if fully set forth herein.

56.     Plaintiff and Ulukaya, who were married at the time of Plaintiff's first investment in Euphrates, agreed to be co-owners in the business.

57.     In furtherance of this agreement, Plaintiff invested approximately $498,000.00 with Ulukaya, to be used as startup capital for Euphrates and to later help establish the yogurt product line for Euphrates, which ultimately was done through Chobani.

58.     Upon information and belief, Ulukaya personally provided none of the startup capital for Euphrates.

59.     Upon information and belief, Ulukaya has caused all of the shares of stock of Euphrates and Chobani to be issued to himself.

60.     Ulukaya has and continues to hold Plaintiff's 53% interest in Euphrates and Chobani in his own name.

61.     Plaintiff has demanded that Ulukaya transfer 53% of the issued and outstanding shares of stock of Euphrates and Chobani to her.

62.     Ulukaya has refused to transfer the stock to Plaintiff.

-8-

63. By reason of the foregoing, Plaintiff demands that the Court impress a constructive trust for her benefit upon 53% of the issued and outstanding shares of stock of Euphrates and Chobani.

64. Plaintiff does not have an adequate remedy at law.

## AS AND FOR A FOURTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Specific Performance

65. Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-64 as if fully set forth herein.

66. Pursuant to the agreement between Plaintiff and Ulukaya, Ulukaya has held since their inception 53% of the issued and outstanding shares of stock in Euphrates for the benefit of Plaintiff.

67. Upon information and belief, Ulukaya was and remains in possession of 100% of the issued and outstanding shares of stock of Euphrates and Chobani, which became a corporate vehicle for the yogurt product line.

68. Plaintiff has demanded that Ulukaya transfer said stock to her, which demand has been refused.

69. By reason of the foregoing, Ulukaya has breached the agreement and Plaintiff seeks a judgment compelling the specific performance by Ulukaya, to wit, an order and judgment compelling Ulukaya to deliver 53% of the issued and outstanding stock of Euphrates and Chobani to Plaintiff.

70. Plaintiff has no adequate remedy at law.

-9-

## AS AND FOR A FIFTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Accounting

71.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-70 as if fully set forth herein.

72.     Commencing from the time that Ulukaya married Plaintiff and continuing thereafter as co-owners of a closely held corporation, Ulukaya and Plaintiff were in a close, confidential relationship.

73.     As a result, Ulukaya owed Plaintiff fiduciary duties in his business dealings with her.

74.     Despite acknowledging that Plaintiff was the beneficial owner of 53% of the issued and outstanding shares of stock of Euphrates and Chobani, Ulukaya has refused to account to Plaintiff for the profits of Euphrates and Chobani.

75.     By virtue of the foregoing, Plaintiff is entitled to an accounting of the business and affairs of Euphrates and Chobani and a judgment directing Ulukaya to pay Plaintiff her share of profits from said businesses and held by Ulukaya.

## AS AND FOR A SIXTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Preliminary and Permanent Injunction

76.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-75 as if fully set forth herein.

77.     As provided above, Plaintiff is the beneficial owner of 53% of the issued and outstanding shares of stock of Euphrates and Chobani.

78.     Should Ulukaya be allowed to transfer the 53% of the stock held by him for Plaintiff's benefit, Plaintiff will suffer irreparable harm.

-10-

79. Plaintiff does not have an adequate remedy at law.

80. By reason of the foregoing, Plaintiff is entitled to a preliminary and permanent injunction preserving the status quo by preventing and enjoining Ulukaya, Euphrates and Chobani and their respective transfer agents from: (a) transferring the shares of stock held by Ulukaya in Euphrates and Chobani; and (b) preventing Euphrates and Chobani from transferring any assets or incurring any obligations outside of their respective ordinary course of business until such time as Plaintiff receives her rightful share of the stock and profits of Euphrates and Chobani.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Breach of Fiduciary Duty

81. Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-80 as if fully set forth herein.

82. As Plaintiff was and is a co-owner of Euphrates, Ulukaya owed Plaintiff a fiduciary duty.

83. By reasons of the foregoing, Ulukaya has breached his fiduciary duty to Plaintiff and Plaintiff has been damaged in an amount to be determined at the trial of this action but in no event less than $530 million.

**WHEREFORE**, Plaintiff demands that judgment be entered against Ulukaya, Euphrates and Chobani as follows, all with appropriate interest, fees and costs:

a. on the first and second causes of action, the principal sum of not less than $1 billion to Euphrates;

-11-

b. on the third cause of action, imposing a constructive trust on behalf of Plaintiff

individually on 53% of the stock of Euphrates and Chobani;

c. on the fourth cause of action, directing Ulukaya to deliver to Plaintiff her shares

of stock, representing her 53% interest in Euphrates and Chobani;

d. on the fifth cause of action, directing an accounting of Euphrates and Chobani;

e. on the sixth cause of action, enjoining Ulukaya, Euphrates and Chobani and their

respective transfer agents from: (a) transferring the shares of stock held by Ulukaya in Euphrates

and Chobani; and (b) preventing Euphrates and Chobani from transferring any assets or incurring

any obligations outside of their respective ordinary course of business; and

f. on the seventh cause of action, the principal sum of not less than $530 million.

Dated: August 13, 2012

**ROSENBERG FELDMAN SMITH, LLP**

By:

Richard B. Feldman
Michael H. Smith
Stephen J. Sassoon
*Attorneys for Plaintiff Ayse Giray*
551 Fifth Avenue, 24th Floor
New York, New York 10176
212-682-3454

-12-

## VERIFICATION

State of New York       )
                        )   ss.
County of New York   )


Ayse Giray, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing Verified Complaint and know the contents thereof; that the same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief.

_____
Ayse Giray

Sworn to and subscribed before me on the **13**ᵗʰ day August 2012

_____
NOTARY PUBLIC

RICHARD B. FELDMAN
Notary Public, State of New York
No. 4984212
Qualified in Westchester County **2014**
Commission Expires July 15, 19**2014**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK                                           Index No.

AYSE GIRAY, individually and on behalf of
EUPHRATES, INC.,

        Plainitff,

    -against-

HAMDI ULUKAYA, EUPHRATES, INC. and
CHOBANI, INC.,

        Defendants.

---

## SUMMONS AND VERIFIED COMPLAINT

---

**ROSENBERG FELDMAN SMITH, LLP**
*Attorneys for Pettitioner*
551 Fifth Avenue
New York, New York 10176
(212) 682-3454

---

To:
Attorney(s) for

---

*Service of a copy of the within is hereby admitted.*

*Dated:* _____

*Attorney(s) for*

---

PLEASE TAKE NOTICE

☐ that the within is a (certified) true copy of a     entered in the office of the clerk of the within named Court on

☐ that an Order of which the within is a true copy  will be presented for settlement to the Honorable      one of the judges of the within named Court,
at ,      at,

Dated:_____

---

**ROSENBERG FELDMAN SMITH, LLP**
*Attorneys for Petitioner*
551 Fifth Avenue
New York, New York 10176
(212) 682-3454

---

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:* _____                                    _____
                                                                *Print Signer's name*

---

**ROSENBERG FELDMAN SMITH, LLP**
*Attorneys for Petitioner*
551 Fifth Avenue
New York, New York 10176
(212) 682-3454

To
Attorney(s) for Plaintiff

# EXHIBIT "B"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X
AYSE GIRAY, individually and on behalf of
EUPHRATES, INC.

Plaintiff,

Index No.: 652838/12

**VERIFIED AMENDED COMPLAINT**

-against-

HAMDI ULUKAYA, EUPHRATES, INC. and
CHOBANI, INC.,

Defendants.

------------------------------------------------------------------X

Plaintiff Ayse Giray, by and through her attorneys, Rosenberg Feldman Smith, LLP and

Sassoon & Cymrot, LLP, as and for her Verified Amended Complaint, individually and on

behalf of Euphrates, Inc., alleges as follows:

1.    Plaintiff Ayse Giray ("Giray" or "Plaintiff") is an individual residing in the City,

County and State of New York where she commenced her medical residency in 1985 and

received her New York State license to practice medicine in 1988.

2.    Plaintiff is a shareholder of defendant Euphrates, Inc.

3.    Plaintiff is the beneficial owner of either thirty-three (33%) or fifty-three percent

(53%) of the shares of stock of defendant Euphrates, Inc.

4.    Upon information and belief, at all times material, defendant Hamdi Ulukaya

("Ulukaya") is an individual residing in the City, County and State of New York and was and is

the president and chief executive officer of defendants Euphrates, Inc. and Chobani, Inc.

5.    Upon information and belief, at all times material, defendant Euphrates, Inc.

("Euphrates") was and is a domestic corporation formed under and by virtue of the laws of the

1

State of New York with its principal place of business at 230 Enterprise Road, Johnstown, New York 12095.

     6.     Upon information and belief, at all times material, defendant Chobani, Inc. ("Chobani"), formerly known as Agro-Farma, Inc. ("Agro-Farma"), was and is a domestic corporation formed under and by virtue of the laws of the State of New York with its principal place of business at 147 State Highway 320, Norwich, New York 13815.

     7.     In 1997 Plaintiff and Ulukaya, both of whom are Turkish, met in Manhattan and in the summer of 1997 were married in the State of New York.

     8.     Ulukaya, whose family operated a dairy farm in Turkey, told Plaintiff of his desire to start a cheese and yogurt business in the United States, but that he did not have the finances to start the venture.

     9.     At the request of Ulukaya, Plaintiff agreed to help finance the venture and to become a co-owner in the business.

     10.     Accordingly, Plaintiff transferred money to Ulukaya in various amounts over time to be used to start up and develop the business.

     11.     On or about September 8, 1997, Plaintiff and Ulukaya formed Euphrates for the purpose of producing and marketing dairy products but which started out primarily producing feta cheese in a factory in Johnstown, New York.

     12.     Thereafter, Plaintiff applied for a business loan for Euphrates, but the loan was not approved because the amount sought (determined by Ulukaya) was too great.

     13.     Later, the bank approved a loan for a lesser amount for Euphrates. The loan was obtained using Plaintiff's finances.

-2-

14. In exchange for Plaintiff's financing, Ulukaya agreed that Plaintiff would be a one-third owner of Euphrates and that he would hold the shares of stock of Euphrates for her benefit.

15. Upon information and belief, Plaintiff and Ulukaya are the sole owners of all of the issued and outstanding shares of stock of Euphrates.

16. Throughout the period 1997-1999, Plaintiff invested various amounts of capital in Euphrates totaling approximately $198,000.00.

17. Upon information and belief, the $198,000.00 investment was used, *inter alia*, to purchase the machinery and equipment necessary to start up and maintain the production of various products for Euphrates.

18. On June 7, 1999, Plaintiff and Ulukaya divorced, although they remained close friends and in business thereafter.

19. In late 2002, Plaintiff and Ulukaya discussed implementing their original concept of a fuller line of dairy products for Euphrates by the manufacture and sale of yogurt as part of Euphrates' business and the need to purchase yogurt making equipment.

20. In October 2002, Plaintiff made an additional capital contribution to Euphrates in the amount of approximately $200,000.00, which was to facilitate the acquisition of yogurt equipment for Euphrates and to support the existing cheese production, and for which she requested an additional 20% interest in Euphrates.

21. Ulukaya agreed to convey the additional 20% interest in Euphrates in exchange for this additional contribution of approximately $200,000.

22. In addition, throughout 2003, Plaintiff continued to contribute operating capital to Ulukaya in order to sustain Euphrates, which was then having cash-flow problems, by making periodic contributions.

-3-

23.    These periodic contributions lasted for around 1 year ending in either 2003 or

2004 and totaled approximately $100,000.00.

24.    On September 19, 2003, Ulukaya delivered to Plaintiff a promissory note in the

amount of $100,000.00, a copy of which is annexed hereto as **Exhibit A.**

25.    Ulukaya also wrote, signed and sent to Plaintiff the letter annexed hereto as

**Exhibit B** (the "Letter").

26.    The Letter confirms that Plaintiff is an owner of 33% of the shares of stock of

Euphrates.

27.    The Letter confirms that Plaintiff would receive an additional 20% of the shares

of stock of Euphrates upon the occurrence of a certain condition.

28.    The Letter, on the letterhead of Euphrates, Inc. states:

"As a President and CEO of the company, Euphrates, Inc., I am
promising that, after we receive our company's shares from investor
company, 20% of the total shares of Euphrates, Inc. will be turned over
to Ayse Giray. With this transaction Ayse Giray will have 53% of the
total shares of Euphrates, Inc.

If we do not get the % 100 percent of the shares from investors, this
promise letter will not be able to meet."

29.    The sentence "With this transaction Ayse Giray will have 53% of the total shares

of Euphrates, Inc." confirms Plaintiff's ownership of 33% of the shares of stock of Euphrates,

Inc.

30.    Upon information and belief, the condition in the Letter for an additional 20% of

the total shares of Euphrates to be turned over to Plaintiff was satisfied.

31.    As a result, Plaintiff is an owner of 53% of the shares of stock of Euphrates.

32.    Though the plan was for the yogurt business to be a component of Euphrates'

business and for Euphrates to purchase yogurt equipment for that purpose, Ulukaya (without the

-4-

knowledge of Plaintiff) became aware of the opportunity to purchase a former Kraft Foods factory in Norwich, New York with which to manufacture yogurt.

33. Upon information and belief, on or about December 1, 2004, and without the knowledge of Plaintiff, Ulukaya formed a separate company Agro-Farma, to purchase the former Kraft Foods factory and to produce the yogurt line as a business separate and apart from Euphrates.

34. Without the knowledge of Plaintiff, Ulukaya used the business operations, assets and property of Euphrates for Agro-Farma to acquire the Kraft Foods yogurt factory in August 2005.

35. Upon information and belief, and without the knowledge of Plaintiff, Ulukaya also used a portion of Plaintiff's October 2002 investment ($200,000.00) to acquire the Kraft Foods factory.

36. Upon information and belief, in 2005, Ulukaya applied for and obtained a Small Business Administration ("SBA") loan to acquire the Kraft Foods yogurt factory, using and secured by a mortgage on Euphrates' property and manufacturing plant and a security interest in its inventory. In the SBA loan application, Ulukaya failed to disclose Plaintiff's ownership interest in Euphrates.

37. Upon information and belief, on or about August 10, 2005, Euphrates issued a press release announcing that it had purchased the Kraft Foods yogurt factory.

38. As part of the SBA loan to acquire the Kraft Foods factory, on or about September 1, 2005, Key Bank, N.A. took a security interest in inventory of Euphrates and Agro-Farma. Annexed hereto as **Exhibit C** is a copy of the UCC financing statements.

39. Upon information and belief, on or about December 27, 2005, Agro-Farma acquired a yogurt case packing machine and the financing statement filed pursuant to said

-5-

acquisition listed Argo-Farma, Euphrates and the Development Chenango Corporation (formerly known as the Chenango County Area Corporation) as secured parties. Annexed hereto as **Exhibit D** is a copy of the UCC financing statement and amendment.

40. After commencing production, Ulukaya used the sales staff and resources of Euphrates for the business operations of Agro-Farma, which later changed its name to Chobani.

41. In a 2012 article on the SBA's website (www.sba.gov) Ulukaya was quoted as follows: "When I started Euphrates, I always thought yogurt quality could be better. As an entrepreneur, in whatever you do, you need to be aware if your category-what's good, what's bad, where the potential is-and I saw that early on. I knew how to sell cheese to the food service industry but the retail yogurt world was a whole different ballgame." Annexed hereto as **Exhibit E** is a copy of the SBA article.

42. In 2007, Plaintiff became aware that Ulukaya had formed Chobani to acquire the Kraft Foods factory and to produce the new yogurt line, contrary to what was agreed.

43. When confronted, Ulukaya promised Plaintiff that she would have the same ownership interest and receive the same percentage of stock of Chobani as he was holding for her in Euphrates.

44. Upon information and belief, Plaintiff and Ulukaya are the sole owners of all of the issued and outstanding shares of stock of Chobani.

45. In recognition of her ownership interest in Euphrates and Chobani, Ulukaya made payments in 2007 to Plaintiff totaling approximately $290,000.00. Ulukaya told Plaintiff that additional payments would be made when Euphrates and Chobani became more profitable.

46. On several occasions thereafter, Ulukaya verbally acknowledged to Plaintiff and third-parties that he and Plaintiff were "partners" in Euphrates and Chobani.

47. By December 2011, Ulukaya had not made any additional payments to Plaintiff.

-6-

48.     When in December 2011 Plaintiff requested from Ulukaya her share of the profits of Euphrates and Chobani, he refused; instead he offered Plaintiff the cheese business (Euphrates) in exchange for her interest in Chobani, an offer he later rescinded.

49.     In response to Plaintiff's demand, Ulukaya refused to provide to Plaintiff her share of profits or an accounting and instead threatened the lives and health of Plaintiff's family.

## AS AND FOR A FIRST CAUSE OF ACTION
## ON BEHALF OF EUPHRATES
### Diversion of Corporate Opportunities and Assets

50.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-49 as if fully set forth herein.

51.     Plaintiff and Ulukaya are the two shareholders in Euphrates where Plaintiff owns either a 33% or a 53% interest.

52.     Plaintiff invested approximately $498,000.00 with Ulukaya, to be used as startup capital for Euphrates and to later help establish a dairy business that included the production and sale of cheese and yogurt.

53.     Ulukaya misappropriated from Euphrates the business opportunity of the yogurt line.

54.     Ulukaya misappropriated the assets and property of Euphrates to acquire the Kraft Foods yogurt factory for Chobani and to start up Chobani.

55.     Ulukaya used the sales staff and resources of Euphrates for the business operations of Chobani.

56.     All of said misappropriations occurred without the knowledge or consent of Plaintiff.

57.     In 2007, Plaintiff learned about the misappropriations after she discovered that Chobani was formed as a separate and distinct entity from Euphrates.

-7-

58.     As an inducement to Plaintiff to forbear from enforcing her and Euphrates' rights,

Ulukaya repeatedly stated to Plaintiff that she had the same ownership interest in Chobani as she

did in Euphrates and that Chobani was a part of Euphrates.

59.     As a result of the foregoing, Euphrates has been damaged in an amount which can

only be ascertained upon an accounting, but is believed to be in excess of $1 billion.

60.     Plaintiff has made no effort to secure the initiation of the instant action by the

Board of Directors of Euphrates because such effort would be futile in that Euphrates is under

the complete control and domination of its sole shareholder of record, Ulukaya.

### AS AND FOR A SECOND CAUSE OF ACTION
### ON BEHALF OF EUPHRATES
### Breach of Fiduciary Duty to Euphrates

61.     Plaintiff repeats and realleges each and every allegation set forth above in

paragraphs 1-60 as if fully set forth herein.

62.     As an officer, director and shareholder of Euphrates, Ulukaya breached his

fiduciary duties to Euphrates by misappropriating the yogurt opportunity and Euphrates' assets.

63.     As a result of Ulukaya's breach of fiduciary duty, he has damaged Euphrates in an

amount which can only be ascertained upon an accounting but is believed to be in excess of $1

billion.

64.     As an inducement to Plaintiff to forbear from enforcing her and Euphrates' rights,

Ulukaya repeatedly stated to Plaintiff that she had the same ownership interest in Chobani as she

did in Euphrates and that Chobani was a part of Euphrates.

65.     Plaintiff has made no effort to secure the initiation of the instant action by the

Board of Directors of Euphrates because such effort would be futile in that Euphrates is under

the complete control and domination of its sole shareholder of record, Ulukaya.

-8-

## AS AND FOR A THIRD CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Constructive Trust

66. Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-65 as if fully set forth herein.

67. Plaintiff and Ulukaya, who were married at the time of Plaintiff's first investment in Euphrates, agreed to be co-owners in the business.

68. In furtherance of this agreement, Plaintiff invested approximately $498,000.00 with Ulukaya, to be used as startup capital for Euphrates and to later help establish the yogurt product line for Euphrates, which ultimately was done through Chobani.

69. Upon information and belief, Ulukaya personally provided none of the startup capital for Euphrates.

70. Upon information and belief, Ulukaya has caused all of the shares of stock of Euphrates and Chobani to be issued to himself.

71. Ulukaya has and continues to hold Plaintiff's interest in Euphrates and Chobani in his own name.

72. Plaintiff has demanded that Ulukaya transfer her interest in the issued and outstanding shares of stock of Euphrates and Chobani to her.

73. Ulukaya has refused to transfer the stock to Plaintiff.

74. By reason of the foregoing, Plaintiff demands that the Court impress a constructive trust for her benefit upon either 33% or 53% of the issued and outstanding shares of stock of Euphrates and Chobani.

75. Plaintiff does not have an adequate remedy at law.

-9-

## AS AND FOR A FOURTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF INDIVIDUALLY
#### Specific Performance

76.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-75 as if fully set forth herein.

77.     Pursuant to the agreement between Plaintiff and Ulukaya, Ulukaya holds either 33% or 53% of the issued and outstanding shares of stock in Euphrates for the benefit of Plaintiff.

78.     Upon information and belief, Ulukaya was and remains in possession of 100% of the issued and outstanding shares of stock of Euphrates and Chobani, which became a corporate vehicle for the yogurt product line.

79.     Plaintiff has demanded that Ulukaya transfer said stock to her, which demand has been refused.

80.     By reason of the foregoing, Ulukaya has breached the agreement and Plaintiff seeks a judgment compelling the specific performance by Ulukaya, to wit, an order and judgment compelling Ulukaya to deliver either 33% or 53% of the issued and outstanding stock of Euphrates and Chobani to Plaintiff.

81.     Plaintiff has no adequate remedy at law.

## AS AND FOR A FIFTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF INDIVIDUALLY
#### Accounting

82.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-81 as if fully set forth herein.

83.     Commencing from the time that Ulukaya married Plaintiff and continuing thereafter as co-owners of a closely held corporation, Ulukaya and Plaintiff were in a close, confidential relationship.

-10-

84.     As a result, Ulukaya owed Plaintiff fiduciary duties in his business dealings with her.

85.     Despite acknowledging that Plaintiff was the beneficial owner of either 33% or 53% of the issued and outstanding shares of stock of Euphrates and Chobani, Ulukaya has refused to account to Plaintiff for the profits of Euphrates and Chobani.

86.     By virtue of the foregoing, Plaintiff is entitled to an accounting of the business and affairs of Euphrates and Chobani and a judgment directing Ulukaya to pay Plaintiff her share of profits from said businesses and held by Ulukaya.

## AS AND FOR A SIXTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Preliminary and Permanent Injunction

87.     Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1-86 as if fully set forth herein.

88.     As provided above, Plaintiff is the beneficial owner of either 33% or 53% of the issued and outstanding shares of stock of Euphrates and Chobani.

89.     Should Ulukaya be allowed to transfer the 33% or 53% of the stock held by him for Plaintiff's benefit, Plaintiff will suffer irreparable harm.

90.     Plaintiff does not have an adequate remedy at law.

91.     By reason of the foregoing, Plaintiff is entitled to a preliminary and permanent injunction preserving the status quo by preventing and enjoining Ulukaya, Euphrates and Chobani and their respective transfer agents from: (a) transferring the shares of stock held by Ulukaya in Euphrates and Chobani; (b) preventing Euphrates and Chobani from transferring any assets or incurring any obligations outside of their respective ordinary course of business until such time as Plaintiff receives her rightful share of the stock and profits of Euphrates and

-11-

Chobani; and (c) taking any corporate action that would result in a dilutive effect upon Plaintiff's

beneficial interest in her ownership of Euphrates and Chobani including, without limitation, the

issuance of any shares of stock of those entities or any rights offering.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## ON BEHALF OF PLAINTIFF INDIVIDUALLY
### Breach of Fiduciary Duty

92.     Plaintiff repeats and realleges each and every allegation set forth above in

paragraphs 1-91 as if fully set forth herein.

93.     As Plaintiff was and is a co-owner of Euphrates, Ulukaya owed Plaintiff a

fiduciary duty.

94.     By reasons of the foregoing, Ulukaya has breached his fiduciary duty to Plaintiff

and Plaintiff has been damaged in an amount to be determined at the trial of this action but in no

event less than $530 million.

**WHEREFORE**, Plaintiff demands that judgment be entered against Ulukaya, Euphrates

and Chobani as follows, all with appropriate interest, fees and costs:

a.  on the first and second causes of action, the principal sum of not less than $1

billion to Euphrates;

b.  on the third cause of action, imposing a constructive trust on behalf of Plaintiff

individually on either 33% or 53% of the stock of Euphrates and Chobani;

c.  on the fourth cause of action, directing defendants to deliver to Plaintiff her shares

of stock, representing her 33% or 53% interest in Euphrates and Chobani;

d.  on the fifth cause of action, directing an accounting of Euphrates and Chobani;

e.  on the sixth cause of action, enjoining Ulukaya, Euphrates and Chobani and their

respective transfer agents from: (a) transferring the shares of stock held by Ulukaya in Euphrates

-12-

and Chobani; (b) preventing Euphrates and Chobani from transferring any assets or incurring any obligations outside of their respective ordinary course of business; and (c) taking any corporate action that would result in a dilutive effect upon Plaintiff's beneficial interest in her ownership of Euphrates and Chobani including, without limitation, the issuance of any shares of stock of those entities or any rights offering; and

      f.  on the seventh cause of action, the principal sum of not less than $530 million.

Dated: October 8, 2012

                    **ROSENBERG FELDMAN SMITH, LLP**

By: _____
                      Richard B. Feldman
                      Michael H. Smith
                      Stephen J. Sassoon
                      *Attorneys for Plaintiff Ayse Giray*
                      551 Fifth Avenue, 24th Floor
                      New York, New York 10176
                      212-682-3454

-13-

Case 1:18-cv-08170-DLC  Document 1-1  Filed 09/07/18  Page 67 of 74

## VERIFICATION

State of New York    )
               )    ss.
County of New York  )

Ayse Giray, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing Verified Amended Complaint and know the contents thereof; that the same is true to my knowledge, except as to the matters therein stated to be alleged upon information and belief.

_____
Ayse Giray

Sworn to and subscribed before me on the ____ day October 2012

_____
NOTARY PUBLIC

MICHAEL H. SMITH
Notary Public, State of New York
No. 02SM6034417
Qualified in Westchester County
Commission Expires December 13, 20__

-13-

Case 1:18-cv-08170-DLC   Document 1-1   Filed 09/07/18   Page 68 of 74

# EXHIBIT "C"

## CONSULTING AGREEMENT

This Independent Consulting Agreement (the "Agreement") is made and entered into effective as of this $\cancel{l}$ $\cancel{(o+)}$
day of $\underline{\phantom{xx}}$ $\underline{\phantom{xx}}$ , 2012 (the "Effective Date") by and between Ayse Giray, a/k/a Sara Baran of 260 West
Broadway, Apt. 8A, New York, New York 10013, ("Giray") and Steve Lebetkin, 95 Morton Street New York, NY
10014, an Individual ("Consultant").

1.      **Services**. Consultant agrees to perform and complete services for; business
consultation, review of business records, and working with attorneys and accountants, all in
relation to a potential law suit (including settlement and negotiation talks) in connection with
establishing Giray's ownership interest to a portion of the shares of stock of Euphrates, Inc. and
Agro-Farma, Inc., n/k/a Chobani, Inc., together with possible claims of breach of fiduciary duty
against Hamdi Ulukaya ("Law Suit"). Consultant and Girary may amend the scope of work in
writing from time to time in accordance with the terms set forth herein (the "Services") and
mutually agreed upon by Giray and Consultant.

2.      **Payment**. In consideration of the Services performed by Consultant, Giray agrees to pay
Consultant $\underline{3}$ % of any recovery Giray receives from the Law Suit, whether by trial settlement
or otherwise. "Recovery" means any and all monies, property, benefits, shares of stock,
membership interest in limited liability companies or other consideration in whatever form
received by Giray directly or indirectly from Hamdi Ulukaya, relating to or concerning the
interest or potential interest in Euphrates, Inc. and Agro-Farma, Inc., n/k/a Chobani, Inc. No
other amounts shall be payable by Giray to Consultant, nor shall Consultant have any additional
obligations to consult other than as defined herein.

3.      **Warranties of Consultant**. Consultant warrants that (a) the Services performed
hereunder will be performed in accordance with any statutes, regulations, ordinances or
contracts applicable to the Services covered hereunder, and will be performed in accordance
with ordinary business custom and usage; (b) no Work Product (as defined below) shall contain
any material owned by any third party, except as disclosed to Giray in writing prior to
Consultant's incorporating such material into any deliverable (and Giray's written approval of
the same), and that as to any such material, Consultant shall have all rights necessary to provide
to Giray the full, unrestricted benefits to such material as incorporated into the deliverable,
including without limitation the right to use, market, distribute and copy, and to provide such
rights to others; and (c) any Work Product (as defined below) shall not infringe any third party
patent, copyright, trademark or misappropriate any third party trade secret or other intellectual
property right.

4.      **Term; Termination**. This Agreement shall begin on the Effective Date and terminate on
the close or termination of the Law Suit or the close of negotiations and settlement of the Law
Suit (the "Term"). Any remedies for breach of this Agreement shall survive any termination or
expiration. Notwithstanding termination of this Agreement, the fees due to Consultant
hereunder shall be paid according to this Agreement.

5.      **Assignment**. This Agreement and the Services contemplated hereunder are personal to
Consultant and Consultant shall not have the right or ability to assign, transfer, or subcontract
any obligations under this Agreement without the prior written consent of Giray, except to an
affiliate of the Consultant.

1

6.     **Notice.** All notices under this Agreement shall be in writing, and shall be deemed given when personally delivered, or three days after being sent by prepaid certified or registered U.S. mail to the address of the party to be noticed as set forth herein or such other address as such party last provided to the other by written notice.

7.     **Confidential Information.** Any business records, financial information, business documents, or other business information, (hereinafter referred to as "Confidential Information") furnished or disclosed to Consultant hereunder shall be deemed the property of and, when in tangible form, shall be returned to Giray. Unless such Confidential Information was previously known to Consultant free of any obligation to keep it confidential, or has been or is subsequently made public by Giray or a third party which had the right to do so, or has been independently developed by Consultant without the benefit of the Confidential Information, it shall be held in confidence by Consultant, shall be used only for the purposes of performing the Services hereunder, and may be used for other purposes only upon such terms and conditions as may be mutually agreed upon in writing. The confidentiality obligations and restrictions in this Agreement will survive termination for a period of 5 years from the date of disclosure of the Confidential Information.

8.     **No Conflicts.** Consultant hereby represents and warrants that Consultant has no commitments or obligations inconsistent with this Agreement.

9.     **Return of Property.** Upon Giray's request, Consultant shall return to Giray all of Giray's property in Consultant's possession or under Consultant's control, including, but not limited to, computer hardware, software, and Confidential Information (regardless of how it is maintained) and any copies thereof.

10.     **Limitation of Liability.** In no event shall either party be liable to the other party for any indirect, special, incidental, consequential or punitive loss or damage of any kind, including lost profits by reason of any act or omission in its performance under this Agreement, regardless of the form of action. Further, in no event shall either party's aggregate liability exceed the amount paid or payable to the Consultant for the work giving rise to the claim.

11.     **Miscellaneous.** The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. No changes or modifications or waivers to this Agreement will be effective unless in writing and signed by both parties. In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of laws provisions thereof. Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of New York or of the federal courts located within the State of New York. By execution and delivery of this Agreement, each of the parties hereto accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the courts of the County of Manhattan, State of New York. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys fees. This Agreement constitutes the entire

2

agreement of the parties hereto, and all previous communications between the parties, whether written or oral with reference to the subject matter of this Agreement, are hereby canceled and superseded. Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Signature Page to Follow

3

IN WITNESS WHEREOF, the parties have executed this Agreement as of the last date written below.

Ayse Giray, a/k/a Sara Baran                    STEVE LEBETKIN

_____                 _____
Signature                                       Signature

AYSE GIRAM                                       Steven Lebetkin
_____                 _____
Printed Name                                    Printed Name

Date: 7/16/12                                    Date: 7/16/12

4

# EXHIBIT "D"

Ayse Giray
1641 Third Avenue, Apt. 24A
New York, NY 10128

September 6, 2012

**VIA CERTIFIED MAIL**
Steven R. Lebetkin
260 West Broadway, Apt. 8A
New York, New York 10013

Re: **Termination as consultant with respect to dispute with Hamdi Ulukaya, Euphrates, Inc. and Chobani, Inc.**

Dear Mr. Lebetkin:

I hereby terminate your services as a consultant. Please direct all future communications to my attorneys, Rosenberg Feldman Smith, LLP at 212-682-3454.

Very truly yours,

Ayse Giray