**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

STEVEN LEBETKIN,                                   Case No.: 1:18-cv-08170 (DLC)(GWG)

                          Plaintiff,          **AMENDED COMPLAINT**

          v.

AYSE GIRAY a/k/a/ SARA BARAN,
LEWIS SASSOON, ESQ.,
SASSOON & CYMROT, LLP,
RICHARD FELDMAN, ESQ.,
MICHAEL SMITH, ESQ.,
STEPHEN SASSOON, ESQ.,
ROSENBERG FELDMAN SMITH, LLP and
ADILE BATUK,

                          Defendants.
-------------------------------------------------------------

Plaintiff, STEVEN LEBETKIN, by and through his attorneys, Verner Simon and Paul W. Verner,

as and for his Amended Complaint against Defendants, AYSE GIRAY a/k/a/ SARA BARAN,

LEWIS SASSOON, ESQ., SASSOON & CYMROT, LLP, AYSE GIRAY a/k/a/ SARA BARAN,

LEWIS SASSOON, ESQ., SASSOON & CYMROT, LLP, RICHARD FELDMAN, ESQ.,

MICHAEL SMITH, ESQ., STEPHEN SASSOON, ESQ., ROSENBERG FELDMAN SMITH,

LLP and ADILE BATUK, hereby alleges as follows:


## **PARTIES**

1.     Plaintiff, Steven Lebetkin ("Lebetkin"), is an individual and a citizen of the County of New

York, State of New York, with an address of 55 Bethune Street, New York, New York 10014.

2.     The Defendant, Ayse Giray, a/k/a Sara Baran ("Giray") is a resident of the Palm Beach

County, State of Florida, with an address of 5600 N. Flagler Dr., Apt 709, West Palm Beach, FL

33407 and is a citizen of the state of New York with a residence there at 166 West 72nd Street, Apt. 7b, New York, New York 10023.

3.      Defendant, Lewis Sassoon is an individual and a citizen of the state of Massachusetts and an attorney admitted to practice in the State of Massachusetts and maintains an office at 84 State Street, 8th Floor, Boston, MA 02109.

4.      Sassoon & Cymrot, LLP, is a limited liability partnership formed under the laws of the state of Massachusetts and engaged in the practice of law with its principal place of business located at 84 State Street, 8th Floor, Boston, MA 02109.

5.      Richard B. Feldman ("Feldman") is an individual and a citizen of the state of New York and an attorney admitted to practice law in the State of New York and maintains an office at 551 Fifth Avenue, New York, NY 10176.

6.      Michael H. Smith ("Smith") is an individual and a citizen of the state of New York and an attorney admitted to practice law in the State of New York and maintains an office at 551 Fifth Avenue, New York, NY 10176.

7.      Stephen J. Sassoon ("Stephen Sassoon") is an individual and a citizen of the state of New York and is an attorney admitted to practice law in the State of New York and maintains an office at 551 Fifth Avenue, New York, NY 10176.

8.      Rosenberg Feldman Smith, LLP ("Rosenberg Feldman") is a limited liability partnership formed under the laws of the state of New York and engaged in the practice of law with its principal place of business located at 551 Fifth Avenue, New York, NY 10176.

9.      Adile Batuk ("Batuk") is an individual and a citizen of the state of New York residing at 86 Henry Avenue, Babylon, NY 11702.

## JURISDICTION/VENUE

10.  Jurisdiction and venue if proper in this Court and the Court may exercise personal jurisdiction over the Defendants because their actions and omissions occurred with the State of New York, County of New York, and the Plaintiff suffered injury within this State.

## FACTS

### The Giray v. Chobani Claims/Lawsuit

11.  Many of the facts relevant to this Action are derived or otherwise result from the Complaint in a $530 Million lawsuit previously brought in this Court entitled *Giray v. Ulukaya, Euphrates, Inc. and Chobani, Inc*., Index No. 652838/2012 which was resolved by settlement on or about July 15, 2015 (Dckt. # 602) (the "Giray Lawsuit").

12.  In the Giray Lawsuit, Plaintiff Giray sued Defendants Hamdi Ulukaya ("Ulukaya") and related corporate entities Ulukaya controlled for equity ownership in the Chobani/Euphrates yogurt and cheese enterprises, respectively.

13.  Giray derived her equity claim arising from her prior marriage to Ulukaya together with her provision of the start-up investment capital which, among other things, was acknowledged by Ulukaya in the form of his prior affirmation of Giray's co-ownership, issuance of promissory notes, and specific written acknowledgment that Giray was the owner of a minimum of 33 1/3 up to as much as 53% of the shares of stock of the company Euphrates.  *See*, *Giray v. Ulukaya, Euphrates, Inc. and Chobani, Inc*., Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶1-38) (*accord*, Amended Verified Complaint, Dckt. #11, *passim*).

***Plaintiff's Personal and Professional***
***Relationship With Defendant Giray***

14.    Plaintiff Lebetkin and Giray began a six-year romantic relationship in 2006.

15.    During their personal relationship, Lebetkin learned of Giray's financial investment in what is now called Chobani and equity ownership claims which had been disavowed by Ulukaya and the companies (as described in Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶1-38)(*accord*, Amended Verified Complaint, Dckt. #11, *passim*).

16.    Lebetkin, formerly a certified public accountant in New York state, chief executive officer of a corporate finance agency, with decades of experience in middle market secured debt financing, is also the son of a well-known lawyer in New York City.

17.    Giray and Lebetkin discussed her legal recourse to recover her fair share of the growing Chobani enterprise. Giray was unable to afford nor identify the proper counsel to represent her and, in fact, Giray had failed in her previous efforts to obtain satisfaction from Ulukaya.

18.    At Giray's request, Lebetkin began to use his professional experience and substantial personal and professional connections to assist Giray in her recovery efforts against Ulukaya.

19.    In consultation with Lebetkin, Giray began to contemplate a lawsuit with respect to her claims against Ulukaya and Chobani in approximately May 2012 and promised Lebetkin that if he were to work on her behalf to analyze Giray's equity claims, to build, assess the value and support the lawsuit, including selecting and managing the appropriate legal counsel, Lebetkin would be compensated for his professional services.

20.    It was clear that Giray had limited resources and that the selected attorneys would have to be retained on a reasonable contingent fee basis and that Lebetkin could only be compensated with some percentage of Giray's ultimate recovery against Ulukaya and Chobani.

21.    In return for her promise, Lebetkin provided, and Giray accepted and availed herself of

Lebetkin's business acumen, professional contacts, professional expertise, and past legal claims experience, which including several filings and prosecutions of commercial litigation as a party as well as the negotiation of settlements of same from a business and financial perspective.

22.     Using Lebetkin's non-lawyer professional skills as set forth above, Giray and Lebetkin began to work on the proposed Giray Lawsuit, including meetings with New York law firms which Lebetkin knew.

23.     In June 2012, Lebetkin contacted attorney Defendant, Lewis Sassoon, to discuss Giray's claims and the anticipated Giray Lawsuit.

### *Plaintiff's Personal and Professional Relationship With Defendant Sassoon*

24.     Lewis Sassoon had been a close personal friend of Lebetkin's for more than 10 years, and the two men had worked together on many varied business transactions and litigations together. Lebetkin was a valuable and productive associate/friend to Lewis Sassoon.

25.     During their relationship Lebetkin learned that Lewis Sassoon had obtained  a Fifteen Million Dollar ($15,000,000) settlement with regard to the Legal Seafoods chain litigation. There Sassoon had represented Legal Seafoods on a contingency basis and earned $5,000,000 in legal fees as a result.

26.     Lebetkin foresaw that because Chobani/Ulukaya possessed great wealth that they could and would attempt to overwhelm many under-resourced plaintiff's attorneys/firms and this was a prospect that the experienced Lebetkin sought to avoid when sourcing litigation counsel such as Sassoon and Sassoon & Cymrot, LLP for Giray.

27.     Because of Sassoon's and Lebetkin's  10-year professional and personal relationship, and because  the  two  professionals  had  worked  successfully  together  on  many  varied  business

transactions and litigations together, Lebetkin viewed Sassoon as a trusted legal professional who would protect Lebetkin while working diligently for both Lebetkin and any litigation client whom Lebetkin introduced to Sassoon and his law firm, Sassoon & Cymrot, LLP.

28.     In passing to Sassoon the duty of sub-contracting with a legal team for Giray's claims against Ulukaya/Chobani and, thus necessarily, the duty of obtaining the derivative earnings Lebetkin stood to gain working as the litigation consultant for Giray and her Legal Team, Lebetkin reasonably placed his trust and confidence in Sassoon and Sassoon & Cymrot, LLP as attorneys.

29.     Lebetkin not only reasonably expected Sassoon and Sassoon & Cymrot, LLP to represent and protect Lebetkin's interests as a consultant to Giray and the Giray Legal Team, but Sassoon and Sassoon & Cymrot, LLP did in fact work for Lebetkin July 2012 in the drafting and construction of Lebetkin's consulting agreement ostensibly to protect Plaintiff's interests.

30.     Lebetkin trusted and relied upon Sassoon and Sassoon & Cymrot, LLP based upon their past successes and historic relationship.  In particular, Lebetkin relied upon the professional legal advice and counsel given to him by Sassoon and Sassoon & Cymrot, LLP in the developing litigation which Lebetkin was structuring for Giray and in the contracting of the consulting relationship between Lebetkin and Giray.

31.     Sassoon and Sassoon & Cymrot, LLP drafted the consulting agreement and reviewed it independently with Lebetkin as Lebetkin's counsel.

32.     Sassoon and Sassoon & Cymrot, LLP specifically recommended that the consulting agreement be interminable (be perpetual for the life of the Giray Lawsuit) and have no clauses allowing for unilateral termination by Giray.

33.     One of the reasons for Sassoon's and Sassoon & Cymrot, LLP's counsel against unilateral termination was the fact that Lebetkin disclosed to Sassoon and Sassoon & Cymrot, LLP that the

romantic relationship between Giray and Lebetkin might not survive intact.

34.     Another reason for Sassoon's and Sassoon & Cymrot, LLP's counsel against Giray's ability to unilaterally terminate Lebetkin was because Sassoon would not be on the case day to day given his primary office location was in Boston and therefore, Lebetkin should also not be in a position of working solely for the New York component of the Giray Legal Team and subject to the Legal Team's possible termination where, in fact, Lebetkin's consulting services included the responsibility to manage the New York component of the Giray Legal Team's activities.

35.     Lebetkin, as a result of his history with Sassoon and Sassoon & Cymrot, LLP, and because of Sassoon's and Sassoon & Cymrot, LLP's counsel and representation of Lebetkin as described above, had a reasonable expectation of representation by Sassoon and Sassoon & Cymrot, LLP and in fact received such representation when contracting with Giray.

36.     During this period and thereafter, in relation to Sassoon and Sassoon & Cymrot, LLP, Lebetkin was in a position of vulnerability and Sassoon and his firm, Sassoon & Cymrot, LLP, were empowered over Lebetkin after Sassoon and Sassoon & Cymrot, LLP accepted their roles as the leaders of the Giray Legal Team and protector of Lebetkin's future earned consulting fees.

37.     Once those roles were accepted by Sassoon and his firm, Sassoon & Cymrot, LLP, and after Giray engaged Sassoon and his firm, Sassoon & Cymrot, LLP, Lebetkin was prevented from effectively protecting himself from the misconduct of the Defendants as is described more fully below.


### *Sassoon Sub-Contracts the New York Giray Legal Team*

38.     In June 2012, nearly immediately after Lebetkin approached his long-time legal colleague Lewis Sassoon with the Giray's putative lawsuit against Chobani, Lewis Sassoon introduced

Lebetkin and Giray to attorneys  Richard B. Feldman ("Feldman"), Michael H. Smith ("Smith") and Stephen J. Sassoon ("Stephen Sassoon")(Lewis Sassoon's son), and the firm of Rosenberg Feldman Smith, LLP ("Rosenberg Feldman"), in order that those attorneys and Lewis Sassoon and Sassoon & Cymrot, LLP would all be formally retained by Giray (thus forming the "Giray Legal Team").

39.     From the dates June 1, 2012 through August 14, 2012, it was specifically discussed and agreed on several occasions between Defendant Sassoon and the other members of the Giray Legal Team, on one side, and Defendant Giray and Lebetkin as the putative client and her litigation/valuation consultant respectively, on the other side,  that the Giray Legal Team would necessarily require and rely upon Mr. Lebetkin's consultation services in order to successfully litigate Giray's claims.

40.     In particular, it was discussed and agreed between them that the Giray Legal Team would produce legal pleadings and argument based particularly upon Lebetkin's professional valuation of the Chobani parties' business from which Giray would be seeking an equitable share.

41.     In short, Lebetkin acted as both consultant to Giray and as a litigation expert to the Giray Legal Team, including Defendants Sassoon and Sassoon & Cymrot, LLP when Lebetkin performed his valuation assessments and other consulting work.  As a result, neither Sassoon and Sassoon & Cymrot, LLP nor the other attorney members of the Giray Legal Team hired another expert before the Giray Lawsuit was settled in July 2015.

42.      It is indisputable that Defendants Sassoon and Sassoon & Cymrot, LLP were the attorneys of record in light of the fact that when the Complaint and Amended Complaint in the Giray Lawsuit was filed in the Supreme Court for the State of New York, New York County,  Sassoon and Sassoon & Cymrot, LLP were identified as Giray's attorneys of record.  **Exhibit A**, p. 1, initial

paragraph, p. 12, closing salutation; **Exhibit B**, p. 1, initial paragraph, p. 12, closing salutation.

### *Lebetkin's Consulting Contract and Giray's Guarantee of a Fee Cap*

43.      During the initial consultations with the Sassoon Defendants and the Rosenberg Feldman attorneys, Lebetkin negotiated for Giray in the exercise of his professional advice and counsel, a contingency fee basis for retaining the Giray Legal Team.

44.     The Sassoon Cymrot and the Rosenberg Feldman attorneys agreed to a contingent fee and further agreed to a cap on those fees at $10 Million Dollars, no greater. In addition to the $10 Million Fee Cap, the Sassoon Defendants and the Rosenberg Feldman attorneys further agreed that the contingent legal fee to be derived by the Giray Legal Team should be reduced to a flat thirty percent (30%) as opposed to the more standard thirty-three and one-third percent (33 and 1/3%) normally insisted upon by New York attorneys.

45.     This reduction to a flat thirty percent (30%) contingent fee, capped at $10 Million Dollars, was made in direct consideration to Giray's obligation to pay Lebetkin a three percent (3%) litigation consultant's fee.

46.     In light of the work already performed and to be performed in the future by Lebetkin for Giray in the prospective Giray Lawsuit and understanding that Giray's and Lebetkin's romantic relationship might not last forever, Lebetkin and Giray then entered into a formal written contract drafted and presented by Lewis Sassoon, a Consulting Agreement, which was executed by both Giray and Lebetkin dated on or about July 16, 2012 (the "Consulting Agreement")(**Exhibit C**).

47.     Again, Lewis Sassoon remained in charge of the Giray Legal Team and, but for issues involving an improvident attempted termination described below, acted as liaison between Lebetkin and Giray from the time of the engagement of the Giray Legal Team until the Giray

Lawsuit was settled on or about July 15, 2015.

48.     Pursuant to the terms of that Consulting Agreement, it was acknowledged that Lebetkin's work included sourcing the Giray Legal Team, reviewing and negotiating the two identical engagement letters with the Giray Legal Team, thereafter providing Giray and her attorneys and advisors with the services detailed in the Consulting Agreement and, as important and his financial and market analysis skills, to manage the lawyers because of Giray's distrust of lawyers generally.

49.     In order to memorialize Lebetkin's role as manager of the Giray Legal Team, and at the direction of Giray, the Consulting Agreement between Lebetkin and Giray was executed prior to the execution of the two engagement letters between Giray and the Giray Legal Team.  Giray refused to execute engagement letters with the Giray Legal Team unless preceded by the Consulting Agreement which required their management by Lebetkin.

50.     The Consulting Agreement set forth that Lebetkin would provide Giray, her attorneys and experts/advisors the following services (collectively the "Services"):

> Consultant agrees to perform and complete services for; business consultation, review of business records, and working with attorneys and accountants, all in relation to a potential law suit (including settlement and negotiation talks) in connection with establishing Giray's ownership interest ……, together with possible claims of breach of fiduciary duty …. ("Law Suit"). Consultant and Giray may amend the scope of work in writing from time to time in accordance with the terms set forth herein (the "Services") and mutually agreed upon by Giray and Consultant.

51.     Lebetkin did in fact fully perform and deliver all the Services contemplated under the Consulting Agreement, including managing the Giray Legal Team, as well as other critical nondelineated Services beyond the written scope of work set forth in the Agreement.  As Consultant to Giray and the Giray Legal Team, Lebetkin performed the following work:

A.    Review and analysis of relevant and historic business records and business loan applications upon which the Ulukaya/Chobani Defendants' businesses were built, particularly, Lebetkin directed the Giray Legal Team to search for what Lebetkin predicted would be discovery of two simultaneous UCC 1 filings and the interrelationships between Euphrates and Chobani (a/k/a Agri-Farms) and the cross-collateralization of Euphrates to support the financing required for Chobani under SBA regulations;

B.    Development of financial analyses and valuations critical to assessing the value of the Ulukaya/Chobani Defendants' business to which Giray claimed title;

C.    Development of financial analyses and valuations critical to assessing the future value and potential public market offering of the Ulukaya/Chobani Defendants' business to which Giray claimed title;

D.    Structuring of various settlement proposals based upon Lebetkin's financial analyses and public market valuations assessing the value and future of the Ulukaya/Chobani Defendants' business;

E.    Developing various strategic arguments and structures related to Giray's claims and based upon the historic business records of the Defendants in the Lawsuit;

F.    Managing the relationships between Giray and the Giray Legal Team and explaining the basis for Giray's equity claims for the Giray Lawsuit (Lebetkin's professional expertise as a corporate finance consultant was relied upon heavily by Giray and the Giray Legal Team); and

G.     Direct intervention with the primary defense counsel for the Ulukaya/Chobani Defendants and the substantial assistance/facilitation of the ultimate settlement reached between the parties after certain missteps by the Giray Legal Team and potential jeopardy to the Giray Lawsuit resulting from the Legal Team's development and use of perjured testimony and evidence adduced from witness/co-Defendant, Adile Batuk.

52.     Under the terms of the Consulting Agreement, Lebetkin was to receive three percent (3%) of any gross recovery Giray received in any form the Giray Lawsuit, whether by trial, settlement or otherwise (the "Consulting Fees").

53.     "Recovery" is defined in the Consulting Agreement as "any and all monies, property, benefits, shares of stock, membership interest in limited liability companies or other consideration in whatever form received by Giray *directly or indirectly* from Ulukaya, relating to or concerning the interest or potential interest in Euphrates, Inc. and Agro-Farma, Inc., n/k/a Chobani, Inc." (emphasis added).

54.     As mentioned above, Defendants Sassoon and Sassoon & Cymrot, LLP, drafted, prepared and presented the Consulting Agreement for Lebetkin to Giray.  Further, Defendants Sassoon and Sassoon & Cymrot, LLP advised Lebetkin regarding the desirability of a perpetual contract with Giray lasting the life of the litigation.

55.     Defendant Feldman, for the Giray Legal Team, reviewed the Consulting Agreement prior to its execution and acquiesced to its terms.

56.     Defendant Lewis Sassoon counseled Lebetkin regarding the terms of the Consulting Agreement on behalf of Lebetkin and assured Lebetkin that Sassoon and Sassoon & Cymrot, LLP would be the paymaster of Lebetkin's fees and would protect them from any interference.

57.     At the time the Consulting Agreement was executed in June 2012, Lebetkin and Giray were still involved romantically and maintained that personal relationship.

58.     Pursuant to the Consulting Agreement, Lebetkin negotiated for Giray the engagement letters with Defendants Lewis Sassoon, Sassoon & Cymrot, LLP, Feldman, Smith, Stephen Sassoon and Rosenberg Feldman and those engagement letters, with a thirty percent flat rate contingent fee, were signed by Giray, Feldman and Sassoon on  July 16, 2012, immediately after Lebetkin and Giray signed the Consulting Agreement.

59.     The reduction from the standard one third (33 and 1/3%) by three percent (3%)(rounded) was negotiated by Lewis Sassoon on behalf of his firm and the other Giray Team Members in order that Giray's net recovery would not be less than the total usual ordinary legal fee after paying Lebetkin's consulting fees owed under the Consulting Agreement. Giray consented Sassoon made the offer to Lebetkin, and the Consulting Agreement was then signed by Giray and Lebetkin.

60.     The legal engagement letters with the Giray Legal Team were signed with the *express oral understanding* between the Giray Legal Team and Lebetkin, as the appointed Consultant and manager of relationship between Giray and the Giray Legal Team, that the total legal fees charged to Giray would be capped at $10,000,000 even if trial of the Giray Lawsuit was required. Lebetkin objected to legal fees that on a formulaic basis would exceed $10,000,000  and which would then be egregious and not in the best interest of Giray. Sassoon checked with Feldman and agreed on behalf of the Giray Legal Team.

61.     In providing his Consultant's Services, Lebetkin became intimately familiar with the factual issues and evidence underlying Giray's legal claims against the Defendants in the Giray Lawsuit and assisted in developing specific strategies and economic analyses which were a

substantial factor, if not instrumental, to the successful resolution of the Giray Lawsuit and settlement obtained by Giray in July 2015.

62.     In performing his services under the Consulting Agreement, Lebetkin provided Giray and the Giray Legal Team with extensive business and third-party lending collateral analyses of the relationships between: (a) Ulukaya, Euphrates and Chobani; as well as (b) the United States Small Business Administration ("SBA"), Empire State Business Development Corporation (a licensed economic development corporation under SBA regulations, and Key Bank, as underwriter of the loan,  in connection with the loan made by Key Bank and guaranteed by the SBA to Chobani in or about 2007 ("the SBA loan").

63.     Based upon the research and analysis performed at the request of Giray and in consultation with the Giray Legal Team, Lebetkin valued the original Giray equity claim to be in excess  of $500,000,000 and provided that analysis and valuation to the Giray Legal Team, subject to learning more through discovery of Chobani's true value believed to be significantly greater.

64.     According to Lebetkin, the Giray equity claim was valued at a minimum of one third (33%) to a maximum of 53% of the total equity value of the Ulukaya companies' business.

65.     Lebetkin's third-party lending and collateral analyses which were provided by him to the Giray Legal Team were the substantial factor, if not instrumental, to the successful settlement of the Giray Lawsuit in July 2015.

66.     Lebetkin also provided consulting services and analyses which evaluated the commercial and economic relationships between the Defendants in the Giray Lawsuit and which spoke to the claim of breach of fiduciary duty that could be asserted by Giray against Defendant Ulukaya, Chobani's CEO, and these analyses were a substantial factor, if not instrumental, in the Giray Legal Team's ability to draft and fashion the Complaint in the Giray Lawsuit.

67.     Subsequently, a first draft of the Complaint was prepared by the Giray Legal Team and sent to Lebetkin for review under the terms of the Consulting Agreement in Lebetkin's capacity as manager of Giray's law firm relationship for Lebetkin's review and comments.

68.     In meetings with the entire Giray Legal Team, including members of the Rosenberg Feldman firm and Giray, Lebetkin repeatedly urged the Giray Legal Team to contact counsel to Ulukaya, Euphrates and Chobani in good faith to attempt to negotiate a settlement prior to the filing of a Complaint in New York State Supreme Court. The Giray Legal Team refused without explanation. Lebetkin warned Giray that Feldman and Sassoon may be motivated to enter into a sustained process to justify egregious legal fees.

69.     Under the Consulting Agreement, Lebetkin urged the Giray Legal Team to include background information relating to the SBA loan that had been applied for and submitted by Giray and Ulukaya on behalf of Chobani in 2007. Feldman initially resisted this change but ultimately included the SBA background information in the Complaint in the Giray Lawsuit. *See*, *Giray v. Ulukaya, Euphrates, Inc. and Chobani, Inc*., Index No. 652838/2012 (Dckt. # 1 – Complaint ¶¶27-31)(**Exhibit A**).

70.     The SBA loan application contained affidavits and documents from Giray and Ulukaya that stated that Giray owned one third of Euphrates, Inc. and Chobani. These admissions also served as part of the collateral for a loan used to acquire the Kraft yogurt manufacturing plant in Johnstown, New York, a facility that became the initial principal yogurt manufacturing facility for Chobani. *Id*.

71.     The filed Complaint in the Giray Lawsuit sought: (i) damages for diversion of corporative opportunities and assets and breach of fiduciary duties to Euphrates, Inc.; (ii) imposition of a constructive trust upon either one-third or 53% of the issued and outstanding

shares of Euphrates, Inc. and Chobani, Inc.; (iii) specific performance directing that Ulukaya deliver to Giray either one-third or 53% of the issued and outstanding shares of Euphrates, Inc. and Chobani, Inc.; (iv) an accounting of the business and affairs of Euphrates, Inc. and Chobani, Inc.; (v) a preliminary and permanent injunction against certain actions of the defendants contrary to Giray's equity claims; and (vi) damages to her individually arising out of Ulukaya's breach of his fiduciary duties to Giray. *Id.*, *accord*, Amended Verified Complaint, Dckt. #11, *passim*.

### Lebetkin and The Rosenberg Feldman Attorneys Quickly Disagree on Critical Case Issues

72.     Lebetkin avers that the Giray Lawsuit was initially jeopardized by the missteps of the Giray Legal Team in offering a July 16, 2012 Affidavit from a witness, Defendant Adile Batuk ("Batuk"), whose testimony was subsequently claimed by the Chobani parties to have been suborned perjury.

73.     In 2012, Batuk was a long term and concurrent intimate of Giray's and was fully aware of Lebetkin's romantic relationship with Giray as well as the prospective Giray Lawsuit and the Consulting Agreement which had been entered into by Giray and Lebetkin.

74.     Soon after the Consulting Agreement was signed, it was discovered by Lebetkin in the performance of his consulting duties that Batuk had offered, or was solicited to offer, and had signed an Affidavit dated July 16, 2012 in support of the Giray equity claims. This false Batuk Affidavit was made part of the Court record in Giray's case by Giray's Legal Team, in particular Defendants Richard Feldman and the Rosenberg Feldman attorneys.

75.     Lebetkin came to discover that the Batuk Affidavit being planned for use in the Giray Lawsuit was incorporating false and misleading statements and was procured by Giray's promise

to pay Batuk $3,000,000 from Giray's ultimate recovery in the action (this amount was later increased to 5% of the total recovery received by Giray).

76.     Lebetkin later discovered that Batuk had hatched a plan with Giray and, upon information and belief, attorney Feldman and Batuk's husband, Omer Gursu, to participate in supplying the false Affidavit in exchange for the redirection of fees that Plaintiff Lebetkin was supposed to be paid under his Consulting Agreement.   Upon information and belief, Batuk conspired with Feldman to tortiously interfere with the Consulting Agreement between Giray and Lebetkin.

77.     Acting in his role as Consultant, Lebetkin strenuously voiced his objections to the Giray Legal Team on four specific issues: (a) the creation and the use of the above-mentioned false Batuk Affidavit; (b) the omission of the SBA information in the complaint in commencement of the action; (c) the wrongful statements by Giray and Ulukaya regarding the validity of their 1997 marriage; and (4) the strategy of approaching the proposed Defendants, Ulukaya, Euphrates and Chobani to negotiate settlement before filing the Giray Complaint.

78.     Lebetkin urged Giray and the Giray Legal Team to first contact the attorneys for Ulukaya, Euphrates and Chobani and to engage in good faith efforts to negotiate a resolution of Giray's equity claims without the filing of a formal legal Complaint.

79.     Lebetkin believed, based upon his analyses and investigation, that Ulukaya had been engaged in lengthy discussions with Goldman Sachs with respect to underwriting an initial public offering of securities of Chobani.  According to Lebetkin, as he told the Giray Legal Team prior to the filing of the Complaint, there was substantial risk to Ulukaya, Euphrates and Chobani in the litigation, and that Goldman Sachs would be unwilling to underwrite a public offering if the Giray equity claim remained unsettled.

80.     Lebetkin urged Giray to require Defendant Feldman to contact Ulukaya's counsel and

Goldman Sachs prior to commencement of an action and negotiate a settlement, and to avoid a protracted litigation and unnecessary legal fees to Feldman's and Sassoon's law firms by settling early on.

81.    Privately, Lebetkin expressed to Giray that, in his opinion, Feldman's and Sassoon's law firms might be churning their legal work  in the case to justify  legal fees and to avoid a fee cap.

82.    Likewise, according to Lebetkin, as he told the Giray Legal Team prior to the filing of the Complaint, there was substantial risk to Giray in proceeding with the ill-conceived Batuk Affidavit in the litigation.

83.    The Giray Legal Team, particularly attorney Feldman, ignored Lebetkin's  numerous requests to show good faith and filed the first Complaint in the Lawsuit on August 14, 2012, without first attempting to negotiate a settlement with the Defendants.

84.    Like the initial draft of the Complaint, the first Demand for Production of Documents drafted by the Feldman firm attorneys omitted a request for the production of the SBA loan documents, which omission, in Lebetkin's opinion, was highly prejudicial to the successful presentation of Giray's claims.  Defendant Feldman took umbrage with Lebetkin's attempts to fulfill his duties at the consultant to Giray and manager of the Giray Legal Team for the benefit of Giray under his Consulting Agreement.

85.    Thereafter, Lebetkin engaged in extremely heated discussions and emails with Defendant Feldman and the other Giray Legal Team members regarding the demand for the SBA loan application documents.

86.    Eventually Giray, who agreed with Lebetkin on the critical nature of the SBA loan documents, demanded the Giray Legal Team, particularly, Feldman, to request the SBA loan documents in the initial request for production of documents under threat that Giray would

immediately seek alternate counsel if the Giray Legal Team did not comply.

87.    In response to Giray's demand, the Giray Legal Team did in fact include the requests for the SBA loan in the amended and served document production demands.

88.    Because of Lebetkin's consulting services and his persistently pushing the Giray Legal Team, particularly Defendant Feldman, on the SBA issues, ultimately, the Supreme Court ordered the Defendants in the Giray Lawsuit to produce the SBA loan application documents to the Giray Legal Team. This Order was a substantial, if not the primary, factor supporting the Giray Legal Team's establishment  of Giray's legitimate equity claims in the Giray Lawsuit.

### *Feldman and the Rosenberg Feldman Attorneys*
### *Tortiously Interfere With Lebetkin's Contract – Batuk Joins*

89.    Over the course of August 2012, having been proven incorrect by Consultant Lebetkin, who had been very strident in his communications on the Batuk Affidavit and SBA issues with the Giray Legal Team, Defendant Feldman, on behalf of the Giray Legal Team, began a campaign and conspiracy to interfere with Lebetkin's Consulting Agreement.

90.    The dispute between Feldman on one hand and Lebetkin of the other hand culminated with Feldman's August 2012 email communication to Lebetkin threatening Lebetkin with a restraining order if Lebetkin did not cease and desist advising and directing Giray regarding the Giray Legal Team's conduct in the Giray Litigation.

91.    Feldman's clear intent was to remove Lebetkin as Consultant to Giray and manager of the Giray Legal Team, thus diminishing Lebetkin's counsel over Giray's case, to thwart any future disclosure of the attorney misconduct in relation to the false Batuk Affidavit and to abrogate the oral understanding and evidence of a fee cap of $10,000,000 on the Giray Legal Team's potential legal fees.

92.    Defendant Feldman at or about that time was informed, together with Defendant Lewis Sassoon, about the deterioration of the romantic relationship between Lebetkin and Giray.  That deterioration had been propelled in large part Lebetkin's knowledge of the falsity of the Batuk Affidavit.   Giray and Feldman refused to alter their bad intent to use the Affidavit despite Lebetkin's protests.  As a result, friction between Giray and Lebetkin  occurred.

93.    After Labor Day weekend 2012, Giray informed Defendants Feldman and Lewis Sassoon, that her romantic relationship with Lebetkin had come to an end.

94.    Feldman thereafter engaged in tortious communications with Giray which were designed to interfere with the Consulting Agreement between Giray and Lebetkin due solely to Defendant Feldman's motivation to be rid of Lebetkin's oversight and to revisit the issue of uncapped contingent fees.

95.    As a direct result of Defendant Feldman's malice, misconduct, intentional miscommunications to Giray, Feldman intentionally induced Giray to breach her Consulting Agreement with Lebetkin.

96.    During the month of August 2012, by way of copies of email communications between Lebetkin, Giray and Feldman, Defendant Sassoon was made fully aware of the strategic disputes between Feldman and Lebetkin and of Lebetkin's substantial objections to the Batuk Affidavit and the handing of the SBA information.

97.    Defendant Lewis Sassoon took no overt action to curtail Defendant Feldman in August 2012 but consoled Lebetkin in his role as counselor and attorney to Lebetkin on the Consulting Agreement and told Lebetkin that he, Lewis Sassoon, would protect Lebetkin's contract and fees and that he, Sassoon, "had his (Lebetkin's) back".  Sassoon specifically promised Lebetkin that he, Sassoon, would travel to New York from Boston once a week, would intersect with his son,

Stephen J. Sassoon at Feldman's firm, and would make sure the case stayed on track and that Lebetkin would stay informed.

98.     However, despite these assurances by Sassoon, on September 6, 2012, Defendant Feldman delivered a purported unilateral termination of the Consulting Agreement signed by Giray and dated September 6, 2012 but which had been solicited from her by Feldman in his campaign to tortiously interfere with the Consulting Agreement (**Exhibit D**).

99.     The tortious interference initiated by Defendant Feldman, was either subsequently tacitly or overtly joined by Lewis Sassoon, and the other Rosenberg Feldman attorneys, and did in fact interfere with Lebetkin's contract with Giray with the interference being timed to take maximum advantage of the fact that Giray and Lebetkin were then having obvious difficulty in their romantic relationship.

100.    As set forth above, the Consulting Agreement was designed by Defendants to be perpetual for the life of the Giray Lawsuit and therefore not capable of being unilaterally terminated.

101.    In accord with Defendant Sassoon's drafting, the Consulting Agreement does not contain any provisions permitting a party to terminate the agreement, whether for cause, without cause or for manufactured reasons.

102.    In fact, the Consulting Agreement expressly provides in Section 4 thereof:

> "**Term; Termination**. This Agreement shall begin on the Effective Date and terminate on the close or termination of the Law Suit (the "Term"). Any remedies for breach of this Agreement shall survive any termination or expiration. Notwithstanding termination of this Agreement, the fees due to Consultant hereunder shall be paid according to this Agreement." (Emphasis added.)

103.    The attempt to "terminate" the Consulting Agreement was an improper retaliation by Defendant Feldman for Lebetkin's highly vocal concern about the improper conduct of Giray

and the Giray Legal Team, and the negative effect that such misconduct would have on the successful resolution of the Giray Lawsuit.

### Sassoon Breaches His Professional, Fiduciary and Contractual Duties to Lebetkin

104.    Upon realizing that Feldman and the Rosenberg Feldman attorneys were tortiously interfering with the Consulting Agreement and inducing Giray to breach the contract with Lebetkin, Lewis Sassoon and Sassoon & Cymrot, LLP nevertheless breached their professional, fiduciary and contractual duties to Lebetkin to protect his contract from the unilateral attempt to terminate and tortious interference by Feldman and the Rosenberg Feldman attorneys.

105.    Despite making private assurances to Lebetkin that they would protect his contract and fees, neither Sassoon and nor Sassoon & Cymrot, LLP interceded to protect Lebetkin's position *vis-à-vis* Giray or Feldman and his law firm despite their having accepted, created and fostered a professional duty as Lebetkin's attorney representatives to do so.

106.    Neither Sassoon and nor Sassoon & Cymrot, LLP interceded to protect Lebetkin's position *vis-à-vis* Giray or Feldman and his law firm despite their having accepted, created and fostered a fiduciary duty as Lebetkin's representatives to do so where Sassoon and Sassoon & Cymrot, LLP. New York law held *de facto* control and dominance over Lebetkin and where Lebetkin heretofore reposed with Sassoon and Sassoon & Cymrot, LLP a high level of confidence and reliance, allowing Sassoon and Sassoon & Cymrot, LLP to exercise control and dominance over Lebetkin and the Consulting Agreement.

### Lebetkin Performs Despite Feldman's Tortious Interference

107.    From 2012 through the beginning of 2014, despite some settlement discussions between

the parties, the Giray Legal Team and the Chobani defense attorneys were deadlocked on the issue with each having drawn lines in the sand which were hopelessly irreversible. In fact, the parties were deadlocked on settlement in July 2014.

108.    Despite the Giray Legal Team's ineffective termination notice, Lebetkin proved after July 2014 to be instrumental in bringing the parties together by focusing their attention on litigation reality and potential publication of information through the already active and media attention. As a direct and proximate result of Lebetkin's work for Giray, the two sides reestablished settlement negotiations and the case resolved by settlement on July 15, 2015.

109.    By March 2015, the Defendants' defense counsel sought, as Lebetkin had predicted, to take advantage of the Batuk affidavit and to discredit Giray and the Giray Legal Team thereby substantially devaluing Giray's otherwise legitimate and valuable equity claims. *See*, Supreme Court  Dckt. ##591-599.

110.    Because of Lebetkin's loyal and steadfast performance of his work and services under the Consulting Agreement, among other non-delineated tasks, Lebetkin was a substantial factor, if not instrumental, in the successful conclusion of the Giray Lawsuit in July 2015.

111.    Lebetkin fully performed his obligations under the Consulting Agreement.

112.    Lebetkin has no further obligations to perform under the Consulting Agreement beyond the services defined therein in writing.

113.    Upon information and belief, the Giray Lawsuit Defendants offered and Giray has accepted a two-part settlement package valued in several millions of dollars, but which may or may not have been less than the true one third to 53% value of Chobani. A portion of this settlement package was not disclosed to the Court and/or to Lebetkin, and therefore the true value of the gross settlement numbers is unknown to Lebetkin and have been hidden from the

Court, him and the public.

114.    Lebetkin is entitled to receive his Consulting Fees in the amounts calculated from Giray's true and actual settlement with the Defendants in the Giray Litigation, pursuant to the Settlement Agreement which is filed under seal with the court and/or pursuant to any other arrangement made between Giray and the Chobani Defendants (or their direct or indirect assigns) which has not been recorded pursuant to the Settlement Agreement which is filed under seal with the court.

115.    Further, pursuant to the terms of the Consulting Agreement, Lebetkin is entitled to three percent (3%) of the gross recovery obtained by Giray from the Defendants (or any of their direct or indirect assigns), whether in the form of cash or other consideration, current or deferred, and whether the consideration is reported or not reported in Settlement Agreement which is filed under seal with the New York Supreme Court.

116.    The Consulting Fees due to Lebetkin are a minimum of three percent (3%) of Giray's settlement amounts plus his share of the lost profits, dependent upon the true value of Giray's settlement, which he would have received but for the wrongful and illegal actions undertaken by Giray and the Giray Legal Team in the Giray Lawsuit.

117.    As set forth below, Lebetkin further pleads that Plaintiff Lebetkin has also been damaged due to the tortious misconduct of the Defendants and Defendant's agents, by being precluded from earning his full Consulting Fees of three percent (3%) of the legitimate and true one-third equity interest in Chobani that Giray originally claimed which Giray clearly owned as set forth in her pleadings in the Giray Lawsuit.

118.    By virtue of Giray's and the other Defendants' wrongful and illegal actions and torts, , Lebetkin was deprived of his Consulting Fees causing Lebetkin a substantial monetary damages pursuant to his entitlement under the Consulting Agreement, namely, the fair market value of

one percent (1%) of the current market value of Chobani (which is three percent (3%) of the one-third interest in Chobani.

119.    The Defendant attorneys were the Defendant Giray's agent when acting in furtherance of the Giray Lawsuit or in relation to the Lebetkin Consulting Fee Agreement.

120.    Upon information and belief, Defendant Lewis Sassoon remained managing attorney in charge of the Giray Legal Team from the time of the engagement of the Giray Legal Team until the Giray Lawsuit was settled in July 2015.

121.    Upon information and belief, Defendant Feldman remained the lead trial attorney for the Giray Legal Team from the time of the engagement of the Giray Legal Team until the Giray Lawsuit was settled in July 2015.

122.    Lebetkin has made repeated demands to Giray, Lewis Sassoon and Feldman for payment of the Consulting Fees as set forth under the Consulting Agreement but neither Giray nor the Giray Legal Team have honored the Consulting Agreement and paid the Fees now due nor planned to pay the Fees that will become due in the future.

123.    Despite the improper and malicious breach of contract by Giray, Giray, who accepted Lebetkin's professional consulting services in furtherance of the successful settlement of the Giray Lawsuit, and who will be paid substantial monies as a result, has or will receive the value of Lebetkin's work.

124.    The reasonable value of Lebetkin's  work can only be measured as a percentage of the Giray settlement and 3% is a reasonable percentage.

125.    Despite their apparent overt or tacit support of the improper and malicious breach of contract by Giray, the Giray Legal Team accepted Lebetkin's professional consulting services in furtherance of the successful settlement of the Giray Lawsuit and they will be paid substantial

attorneys' fees as a result. The reasonable value of Lebetkin's work can only be measured as a percentage of the Giray settlement and 3% is a reasonable percentage.

126.    Plaintiff's discovery of the Defendants' specific acts or their misconduct as well as the motives behind the Defendants acts did not occur until the mediation of the dispute and presentation of certain defenses by attorney Feldman in November 2016.

127.    Likewise, because the tortfeasors conspired against him and have hidden their communications such as those intending to induce Giray to breach her contract with Lebetkin, much of the evidence of the conspirators' scientor and intent to injure Lebetkin is hidden from him but is expected to be fully disclosed in discovery.

128.    Further, the Chobani settlement from which Ms. Giray derives her funds, and upon which she was obligated to pay Lebetkin his consulting fees, is upon information and belief, still being paid over time. Accordingly, the breaches of contracts and torts described in this Amended Complaint are of a continuing nature and discovery of the undisclosed settlement payments will be necessary for Plaintiff to fully discovery the nature and time of each contract breach and torts.

129.    Despite due demand, Plaintiff has not been paid his earned Consulting Fees.

130.    No Defendant has never offered a reason for their refusal to honor the Consulting Agreement except that upon closing the settlement with Chobani in 2015, Lebetkin was subsequently told in a telephone call by Lewis Sassoon that the 3% Consulting Fee was simply "too much money". No further explanation has ever been offered by anyone.

## FIRST CAUSE OF ACTION
**Breach of Contract**

### *Defendant Giray*

131.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

132.    Plaintiff and Defendant Giray entered into a legally binding Consulting Agreement.

133.    In consideration of the Consulting Fees to be paid, Lebetkin provided the Giray and her Legal Team with the agreed Services pursuant to the Consulting Agreement.

134.    Lebetkin has made repeated demands for payment of his Consulting Fees which Defendant Giray through her attorneys has ignored.

135.    Giray has failed and refused to pay the Consulting Fees for the Services as required by the Consulting Agreement.

136.    Giray has breached the Consulting Agreement without justification.

137.    As a result of Giray's breach, Plaintiff has been damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

### *Defendant Giray*

138.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

139.    Plaintiff Lebetkin and Defendant Giray entered into a legally binding Consulting Agreement which could not be terminated at will and which, during the provision of the Consulting Services to Giray, Lebetkin owed certain contractual duties to Giray.

140.    Defendant Giray also had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by the Giray Legal Team and its Members.

141.    Defendant Giray, in privity with the Defendant attorneys, and as their principal and client, and given her romantic relationship with Lebetkin, had a duty to protect Lebetkin's Consulting

Fees which duty was grounded in a higher level of trust than normally present in the marketplace involving standard arm's length business transactions.

142.    Giray engaged in misconduct when, with Giray's full knowledge, Giray allowed her agents/attorneys, the Giray Legal Team as headed, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, to attempt to terminate the Consulting Agreement with Lebetkin which was interminable and perpetual by its terms.

143.    Giray knew and understood that the attempted termination was invalid and was undertaken solely because the Giray Legal Team, spearheaded by attorney Feldman, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, had engaged in malicious, fraudulent and bad faith retaliation because Lebetkin had openly challenged Feldman concerning his misconduct and missteps with the suborned affidavit of witness Batuk and the failed discovery and use of the SBA and immigration background evidence.

144.    Giray knew that the attorney Feldman, as a member of the Giray Legal Team which was headed, overseen and managed by the Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, were attempting to quiet Lebetkin in order to avoid potential penalties against them in relation to the Batuk affidavit, the SBA discovery and/or disclosure of how these missteps and mistakes were devaluing the Giray claims.

145.    Despite this knowledge, in breach of their special trust relationship and Giray's fiduciary duty to Lebetkin, Giray failed to prevent her agent attorney Feldman and the other members of the Giray Legal Team from trying to terminate Lebetkin and from attempting to ostracize Lebetkin.

146.    Giray's breach of fiduciary duty was driven by her bad intent and allowed her to obtain the benefit of Lebetkin's services while avoiding payment of the Consulting Fees.

147.    As a direct result of the Defendant Giray's breach of fiduciary duty to the Plaintiff,

Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

#### *Defendants Lewis Sassoon and Sassoon & Cymrot, LLP*

148.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

149.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by other persons associated with the Giray Legal Team including the Rosenberg Feldman attorneys and Defendant Giray.

150.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, as the negotiators, drafters, architects of the Consulting Agreement, and as the attorneys responsible for working for Plaintiff Lebetkin and whom were envisioned by Lebetkin to act in the future as the paymasters of any consultant's fees due to Plaintiff from a gross recovery made on behalf of Giray, also accepted and fostered an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by other persons associated with the Giray Legal Team including the Rosenberg Feldman attorneys and Defendant Giray.

151.    Lebetkin's historic 10-year professional association with Lewis Sassoon and Sassoon's law firm and the introduction by Lebetkin to the Giray Lawsuit against Chobani/Ulukaya were not simply common place arm's length commercial transactions, but rather, Sassoon and his firm were held in a position of confidence and trust by Lebetkin sufficient that a fiduciary relationship arose

given the extraordinary circumstances of the Giray Lawsuit referral where Sassoon and his firm were skilled attorneys, had actually represented Lebetkin in the negotiation of the Consulting Agreement with Giray and likewise specifically advised Lebetkin to avoid a unilateral right of termination by Giray in the Agreement given the uncertain future of the romantic relationship between Lebetkin and Giray.

152.    Defendants Lewis Sassoon and Sassoon & Cymrot, LLP, as the head of the Giray Legal Team, had an historic and clear attorney-client relationship with the Plaintiff Lebetkin and thus had a duty to protect Lebetkin's Consulting Fees which was grounded in a higher level of trust placed in them by Lebetkin than is normally present in the marketplace involving standard arm's length business transactions.

153.    Upon learning of the motive and conduct of Feldman and the Rosenberg Feldman attorneys to interfere with Giray's contract with Lebetkin, and/or Giray's otherwise illegitimate attempt to unilaterally terminate the contract,  Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, took no steps to protect their client's, Lebetkin's, interests, failed to fulfill their professional and fiduciary duty to protect Lebetkin's contractual rights and allowed Feldman and the Rosenberg Feldman attorneys to engage in interference with Lebetkin's contract, with full knowledge of their professional and fiduciary duties to Lebetkin.

154.    As a direct result of the Defendants, Lewis Sassoon's and Sassoon & Cymrot, LLP's, breach of their professional and fiduciary duties to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty

### *Defendants Richard Feldman, Michael Smith,*
### *Stephen Sassoon, and  Rosenberg Feldman Smith, LLP*

155.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

156.    Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution by other persons associated with the Giray Legal Team including the Sassoon & Cymrot  attorneys and Defendant Giray.

157.    Defendants Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, as attorney Members of the Giray Legal Team, were viewed by the Plaintiff Lebetkin as professionals whom Lebetkin held in high regard was and in whom Lebetkin placed a higher level of trust than is normally present in the marketplace involving standard arm's length business transactions.

158.    Upon learning of the motive and misconduct of Giray and/or Giray's otherwise illegitimate attempt to unilaterally terminate the Consulting Agreement,  Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, took no steps to protect Lebetkin's, interests, failed to fulfill their fiduciary duty to protect Lebetkin's contractual rights and allowed Giray to wrongfully terminate Lebetkin's contract, in contravention of their professional and fiduciary duties to Lebetkin.

159.    As a direct result of the Defendants, Richard Feldman's, Michael Smith's, Stephen Sassoon's and  Rosenberg Feldman Smith, LLP's, breach of their professional and fiduciary duties

to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### Professional Malpractice

### *Defendants Lewis Sassoon and Sassoon & Cymrot, LLP*

160.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

161.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP entered into a professional attorney – client relationship with Lebetkin in relation to Lebetkin's Consulting Agreement with Giray.

162.    Upon Giray's attempt to terminate the Agreement and/or Feldman's interference with it, Sassoon and Sassoon & Cymrot, LLP had a professional duty to protect Lebetkin and ensure performance of the contract at the time they realized a potential breach and/or tortious interference by their associates, Feldman and the Rosenberg Feldman attorneys.

163.    Lebetkin, as a result of his history with Sassoon and Sassoon & Cymrot, LLP, and because of Sassoon's and Sassoon & Cymrot, LLP's counsel and representation of Lebetkin as described above, had a reasonable expectation of representation by Sassoon and Sassoon & Cymrot, LLP and in fact received such representation when contracting with Giray.

164.    Lewis Sassoon and Sassoon & Cymrot, LLP possessed that degree of skill and acumen required of them as counsel to Lebetkin and in the exercise of their professional duty to Lebetkin should have and could have protected Lebetkin's contract from improper breach and protected payment of Lebetkin's fees from Giray's settlement proceeds.

165.    Lewis Sassoon and Sassoon & Cymrot, LLP failed to exercise their professional duties as attorneys to Lebetkin in relation to the Consulting Agreement.

166.     But for Lewis Sassoon's and Sassoon & Cymrot, LLP's negligence and failure to perform their duties to Lebetkin, Lebetkin's contract would not have been breached by Giray and Lebetkin's fees under the Agreement would have been protected.

167.     Lebetkin has been damaged as a result of Lewis Sassoon's and Sassoon & Cymrot, LLP's professional negligence and malpractice.

<u>**SIXTH  CAUSE OF ACTION**</u>
**Tortious Interference With Existing Contract**

***Defendants, Richard Feldman, Michael Smith,***
***Stephen Sassoon, Rosenberg Feldman Smith, LLP,***
***Lewis Sassoon, Sassoon & Cymrot, LLP and Batuk***

168.     Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

169.     Giray and Lebetkin had an enforceable, valid and perpetual Consulting Agreement where Lebetkin would provide services to Giray and her Legal Team in exchange for compensation.

170.     Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, as members of the Giray Legal Team knew of the existence of the Consulting Agreement between Giray and Lebetkin.

171.     Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, intentionally, deliberately and with the intent of causing a breach, induced Giray to breach her Consulting Agreement with Lebetkin.

172.     Batuk joined with Feldman in the campaign to tortiously interfere with the Consulting Agreement in order to take over and replace Lebetkin's financial position with Giray and to assume Lebetkin's 3% consulting fee plus, to which Giray added an additional 2% for a total of 5%.

173.     Batuk further possessed a malicious intent to injure Lebetkin because she was jealous of

Giray's romantic relationship with Lebetkin.

174.    Had the Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Batuk, Lewis Sassoon and Sassoon & Cymrot, LLP, not intentionally induced Giray to breach her Consulting Agreement with Lebetkin, Giray would not have otherwise breached the contract.

175.    Upon information and belief, each of the Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Batuk, Lewis Sassoon and Sassoon & Cymrot, LLP, joined in a conspiracy with one another to intentionally interfere and induce Giray to breach her contract with Lebetkin.

176.    As a direct result of the Defendants', Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Batuk,  Lewis Sassoon and Sassoon & Cymrot, LLP, tortious interference with the Giray-Lebetkin Consulting Agreement, Plaintiff has been damaged.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty

*Defendants, Richard Feldman, Michael Smith,*
*Stephen Sassoon, Rosenberg Feldman Smith, LLP,*
*Lewis Sassoon and Sassoon & Cymrot, LLP*

177.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

178.    Defendant Giray had an independent fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution.

179.    Each of the Defendant attorneys, Richard Feldman, Michael Smith, Stephen Sassoon and Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP knew of: (1) the

fiduciary duty of Giray running to Lebetkin on the issue of protection of Lebetkin's Consulting Fees; (2) the existence of the Consulting Agreement; (3) that the Agreement was valid, enforceable and could not be terminated at will; (4) that Lebetkin fully performed his obligations in accord with the terms of the Agreement; and (5) that the personal relationship between Giray and Lebetkin had eroded or was then eroding.

180.    Defendants, Lewis Sassoon and Sassoon & Cymrot, LLP, heading, overseeing and managing the Giray Legal Team, as the negotiators, drafters, architects of the Consulting Agreement, and as the attorneys responsible for working with Plaintiff Lebetkin and for acting as the paymasters of any fees due to Plaintiff from a gross recovery made on behalf of Giray, knew of Giray's fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution.

181.    Defendants, Richard Feldman, Michael Smith, Stephen Sassoon and Rosenberg Feldman Smith, LLP, driven by their bad motive to quiet Lebetkin and avoid further confrontation regarding the Batuk Affidavit, the SBA loan information and their misconduct, knew of Giray's fiduciary relationship and duty running to Plaintiff Lebetkin to ensure and protect Lebetkin's earned Consulting Fees from non-payment, poaching, interference and dissolution.

182.    Defendants, Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, despite their knowledge of Giray's fiduciary duty to Lebetkin, substantially assisted Giray in breaching her fiduciary duty to the Plaintiff Lebetkin.

183.    Defendant agents/attorneys, Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, engaged in aiding and abetting misconduct.

184.   Defendant agents/attorneys, Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, were the substantial factor in Giray's breach of fiduciary duty to Lebetkin.

185.   Because of their bad faith motives and malice, the aiding and abetting misconduct of the Defendant attorneys, Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, was egregious and shocks the conscience of normal persons.

186.   As a direct result of the Defendant attorneys', Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, aiding and abetting Giray's breach of fiduciary duty to the Plaintiff, Plaintiff Lebetkin has been damaged in an amount to be proven at trial.


### EIGHTH CAUSE OF ACTION
**Unjust Enrichment**

***Defendants Giray, Richard Feldman, Michael Smith,***
***Stephen Sassoon, Rosenberg Feldman Smith, LLP,***
***Lewis Sassoon and Sassoon & Cymrot, LLP***

187.   Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

188.   Should the Plaintiff's contract claims fail, alternatively, Plaintiff had performed and continued to perform his Consulting Services for Giray and her Legal Team in accord with its provisions despite their attempt to terminate and ostracize him.

189.   Defendant Giray received the benefit and value of Lebetkin's consulting work and successfully concluded the Giray Lawsuit as a result.

190.   At the same time, the attorney Defendants, Lewis Sassoon, Sassoon & Cymrot, LLP,

Richard Feldman, Michael Smith, Stephen Sassoon, and  Rosenberg Feldman Smith, LLP were the obvious intended third-party beneficiaries of the Consulting Agreement and Lebetkin's performance.

191.    The attorney Defendants derived the value of Lebetkin's consulting services and would have otherwise paid for those services in the form of experts' fees if Lebetkin's Consulting Fees were not to have been paid as a percentage of Giray's settlement obtained from the Chobani parties.

192.    It would be inequitable to allow the Defendants, Giray, Lewis Sassoon, Sassoon & Cymrot, LLP, Richard Feldman, Michael Smith, Stephen Sassoon, and  Rosenberg Feldman Smith, LLP to receive the value of Lebetkin's work without compensating him.

193.    The Defendants have admitted that the reasonable value of Lebetkin's work should be measured as a percentage of the Giray settlement and that three percent (3%) is a reasonable percentage.

194.    Denying Plaintiff Lebetkin recovery for the value of his services provided to the Defendants Giray, Sassoon, Sassoon & Cymrot, LLP, Richard Feldman, Michael Smith, Stephen Sassoon, and  Rosenberg Feldman Smith, LLP  would be inequitable and unjust.

195.    The value of the unjust enrichment to Defendants is a sum which shall be proven at trial.


### NINTH CAUSE OF ACTION
#### *Quantum Meruit*

***Defendants Giray, Richard Feldman, Michael Smith,***
***Stephen Sassoon, Rosenberg Feldman Smith, LLP,***
***Lewis Sassoon and Sassoon & Cymrot, LLP***

196.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

197.    Should the Plaintiff's contract claims fail, alternatively, Plaintiff had performed and continued to perform his Consulting Services for Giray and her Legal Team in accord with its provisions despite their attempt to terminate and ostracize him.

198.    As a result of Lebetkin's provision of the Consulting Services, both Giray and the Members of the Giray Legal Team benefitted with each, Giray on one hand and the Legal Team on the other hand, deriving large settlements and large contingent attorneys' fees as a result.

199.     Lebetkin's provision of the Consulting Services at Plaintiff's expense was accepted by the Defendants.

200.    In equity and good conscience Defendants should be required to compensate Plaintiff for the true and reasonable value of his services at three percent (3%) of the sums they have derived and will derived in the future from the Giray Lawsuit.

201.    Plaintiff Lebetkin provided and Defendants accepted the litigation consulting services pursuant to the terms of the Consulting Agreement.

202.    Both Giray as the client and the Defendant attorneys, Richard Feldman, Michael Smith, Stephen Sassoon, Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP, accepted the Plaintiff's performance and benefitted as a result.

203.    Defendants owe Lebetkin for the reasonable value of his work.

204.    Defendants have failed and refused to pay for these valuable services.

205.    Plaintiff Lebetkin is entitled to be paid the fair market value of his services rendered pursuant to the Consulting Agreement.

206.    The reasonable value of Lebetkin's services is three (3%) of the total settlement received and to be received by Giray from the Chobani parties.

## TENTH CAUSE OF ACTION
### *Prima Facie* Tort

### *Defendants Giray and Richard Feldman*

207.    Plaintiff incorporates each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth here at length.

208.    Plaintiff Lebetkin provided litigation consulting services pursuant to the terms of the Consulting Agreement to Defendant Giray and the Defendant attorneys, Richard Feldman, Michael Smith, Stephen Sassoon and  Rosenberg Feldman Smith, LLP, Lewis Sassoon and Sassoon & Cymrot, LLP.

209.    Giray  determined to engage in intentional infliction of harm to Lebetkin solely due to his ending of their romantic relationship in August 2012.

210.    Richard Feldman likewise determined to engage in intentional infliction of harm to Lebetkin solely due to his contradicting and challenging Feldman's solicitation and use of the Batuk Affidavit and failure to diligently address the SBA loan discovery as advised by Lebetkin.

211.    Giray and Feldman thereafter both engaged in the intentional infliction of harm to Lebetkin by cutting him out of and ostracizing him from the Giray Legal Team through the subterfuge of the "termination" of the Consulting Agreement.

212.    Although Giray and Feldman have argued and will argue that the termination was justified and lawful, and/or otherwise lawful, there was, in fact, no excuse or justification for the purported termination.

213.    As a direct result of the misconduct of Giray and Feldman, Lebetkin suffered special damages measured by the loss of Lebetkin's Consulting Fees.

214.    Giray and Feldman were solely driven by their  malevolence towards Lebetkin which was

is the sole motive for Giray's and Feldman's otherwise lawful act and Giray and Feldman had no

other motive other than to injure Lebetkin.

215.    Giray and Feldman have committed the tort of *Prima Facie* Tort as a result.

216.    Lebetkin was damaged thereby.


**JURY DEMAND**

Plaintiff demands a trial by jury on all issues presented in this complaint.


**WHEREFORE**, Plaintiff Lebetkin demands judgment against Defendants on the FIRST through

TENTH CAUSES OF ACTION for:

    (A)    Compensatory damages in an amount to be determined at a trial;

    (B)    Pre-and post-judgment interest;

    (C)    Punitive damages;

    (D)    Reasonable attorneys' fees;

    (E)    Costs and disbursements; and

    (F)    Such other and further relief as the Court deems just and equitable.


Dated: September 26, 2018

                        **VERNER SIMON**


                  By:    */S/ Paul W. Verner*
                       Paul W. Verner, Esq.
                       *Attorneys for Plaintiff*
                       30 Wall Street, 8th Floor
                       New York, NY 10005
                       (212) 502-5500

pwverner@vernerlaw.com

## DECLARATION

STEVEN LEBETKIN, an individual over the age of majority, purusant to 28 U.S.C § 1746, swears under penalty of perjury that I have read the allegations set forth in the above Amended Complaint and know the contents thereof; that same is true to my own knowledge except as to matters alleged upon information and belief, and to those matters, I believe them to be true.

Sworn to this 26 day of September, 2018.

STEVEN LEBETKIN