UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                      :
STEVEN LEBETKIN,                      :
                                      :
                        Plaintiff,    :        18cv8170 (DLC)
              -v-                     :
                                      :        OPINION AND ORDER
AYSE GIRAY a/k/a SARA BARAN and JOHN  :
DOES 1 through 25,                    :
                        Defendants.   :
                                      :
--------------------------------------X

APPEARANCES

For the plaintiff:
Paul W. Verner
Verner Simon
30 Wall Street, 8th Floor
New York, NY 10005

For the defendant:
Stephen M. Rosenberg
Richard B. Feldman
Michael H. Smith
Rosenberg Feldman Smith, LLP
551 Fifth Avenue, 24th Floor
New York, NY 10176


DENISE COTE, District Judge:

     Plaintiff Steven Lebetkin and defendant Ayse Giray entered

into a Consulting Agreement (the "Agreement") in 2012.  Lebetkin

alleges that Giray breached the Agreement by failing to pay him

a contingency fee for his services.  Defendant has moved for

summary judgment.  For the following reasons, defendant's motion

is granted.

# **Background**

The following facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.

## The Agreement

Giray was formerly married to Hamdi Ulukaya, the founder of the Chobani yogurt brand.  They divorced in 1999.  In 2006, Giray and Lebetkin began a romantic relationship.

In June 2012, Lebetkin contacted Lewis Sassoon, an attorney, to discuss a potential lawsuit by Giray against Ulukaya which would assert that she was entitled to an equity stake in Chobani.  Sassoon introduced Lebetkin and Giray to attorneys at the firm of Rosenberg Feldman Smith, LLP ("RFS"), including, as relevant here, Richard Feldman.  Sassoon prepared a draft of a consulting agreement for Lebetkin and Giray to sign, which they did at the RFS offices on July 16, 2012.

The Agreement begins by describing the services that Lebetkin was to provide Giray and the payment that he was to receive in return:

> **1. Services**.  Consultant [Lebetkin] agrees to perform and complete services for; [sic] business consultation, review of business records, and <u>working with attorneys</u> and accountants, all in relation to a potential law suit (including settlement and negotiation talks) in connection with establishing Giray's ownership interest to a portion of the shares of stock of Euphrates, Inc. and Agro-Farma, Inc. n/k/a Chobani, Inc., together with possible claims of breach of fiduciary duty against Hamdi Ulukaya ("Law Suit").

2

> Consultant and Girary [sic] may amend the scope of
> work in writing from time to time in accordance with
> the terms set forth herein (the "Services") and
> mutually agreed upon by Giray and Consultant.
>
> **2. Payment.** In consideration of the Services
> performed by Consultant, <u>Giray agrees to pay
> consultant 3%</u> of any recovery Giray receives from the
> Law Suit, whether by trial settlement or otherwise.
> "Recovery" means any and all monies, property,
> benefits, shares of stock, membership interest in
> limited liability companies or other consideration in
> whatever form received by Giray directly or indirectly
> from Hamdi Ulukaya, relating to or concerning the
> interest or potential interest in Euphrates, Inc. and
> Agro-Farma, Inc., n/k/a Chobani, Inc. No other
> amounts shall be payable by Giray to Consultant, nor
> shall Consultant have any additional obligations to
> consult other than as defined herein.

(Emphasis added.) According to Lebetkin, the Agreement's

reference to "working with attorneys" meant that he would act as

a "liaison" or "go between" for Giray and her attorneys.

Also of importance, the Agreement included the following

language concerning its termination:

> **4. Term; Termination.** This Agreement shall begin on
> the Effective Date [July 16, 2012] and terminate on
> the close or termination of the Law Suit or the close
> of negotiations and settlement of the Law Suit (the
> "Term"). Any remedies for breach of this Agreement
> shall survive any termination or expiration.
> <u>Notwithstanding termination of this Agreement, the
> fees due to Consultant hereunder shall be paid</u>
> according to this Agreement.

(Emphasis added.)

3

<u>Termination Notice</u>

Lebetkin's relationship with Giray, Sassoon, and the RFS attorneys rapidly became contentious.[1]  On August 2, Giray directed Lebetkin to only contact her attorneys with her consent.  In particular, she emailed Lebetkin:  "[P]lease do not write anything without my consent and on my behalf.  why is this???  YOu are worrying me as if this was your case.  I am very upset."  Lebetkin sent the following reply:

> I am not going to fight with you about this.  The
> assignment, which is extremely common, requires that I
> "<u>perform and complete services for; business
> consultation, review of business records, and working
> with attorneys and accountants</u>."  That is very clear
> to work on these kinds of records directly with the
> lawyers.  You want to change that, and you have asked
> in writing for me not to work directly with the
> attorneys.  So, I will follow your instructions on
> this requested change.  And when they ask me about any
> records and business consultation, I will tell them
> you changed the agreement and I agreed.  That means
> simple things like asking for bank statements and
> other administrative things.
>
> No problem.
>
> Sleep well.

---

[1] In the brief period between the execution of the Agreement and Giray advising Lebetkin that it was terminated, Lebetkin did very little work.  Among a few other things, he sent a "draft Chobani Litigation Worksheet" to the attorneys on July 18, explaining that he had prepared it "last night."  He attached three Microsoft Excel sheets, which summarized Giray's contributions to and disbursements from Euphrates, Inc., an entity related to Chobani, Inc.  Also, between July 30 and August 2, Lebetkin exchanged emails with RFS attorneys concerning his attempts to obtain bank records that would support Giray's claims.

Later that night, Giray again instructed Lebetkin to not send communications to her attorneys without copying her.  She wrote: "[D]id you send them another e mail?  This is way too much.  you go overboard you are making me [sic] impossible to work with lew [Lewis Sassoon].  You are ruining things.  Stop e mailing withou[t] me seeing them[.]"  Lebetkin replied, "I did not[.]"

Despite Lebetkin's assertion that he would follow Giray's instruction "not to work directly with the attorneys," he sent them numerous communications during August.  On August 4, Lebetkin sent the attorneys his analysis of a Small Business Administration loan that Chobani had received in 2005.  On August 16, he asked the attorneys to "research title and mortgage filings" for certain New York City apartments.  On August 20, he forwarded the RFS attorneys a <u>New York Times</u> article concerning a lawsuit that alleged Chobani had misleadingly labeled its products.[2]  Lebetkin asked the attorneys to "come up with an estimated amount of financial exposure to chobani" related to the labeling lawsuit, asserting that it "makes all the difference in our approach towards settlement." Feldman replied,

---

[2] <u>See</u> Stephanie Strom, <u>Lawyers From Suits Against Big Tobacco Target Food Makers</u>, N.Y. Times (Aug. 18, 2012), https:// www.nytimes.com/2012/08/19/business/lawyers-of-big-tobacco-lawsuits-take-aim-at-food-industry.html.

It would be near impossible to comply with your
request at this juncture. We do not know the status
of the proceedings in the class action suit; the
likelihood of their success on the merits; the nature
and extent of the evidence; nor do we have access to
their experts or any reports from them. Thus, there
is no basis for us to make any sort of estimate.

We need to remain focused on our case!!!

On August 23, Lebetkin sent an email to the attorneys from

Giray's account, purporting to express her displeasure with

their work. The email stated, in relevant part:

I am writing to let you know of my displeasure and
disappointment with the legal representation received
to date. In particular, it is clear that I, not you,
am doing extensive work and research on this matter
that you should be doing. . . .

Here are some examples:

You were not aware from public information that
Chobani plans a public offering through Goldman Sachs.

I informed you of [a] recent contamination lawsuit in
the public record against Chobani and the related
settlement. This was not researched at all, only by
me. . . .

There has been no effort to further promote publicity
in the media, particularly important publications such
as Wall Street Journal, NY Times, Fortune or other
notable concerns to keep the pressure up. . . .

Therefore, please let me know if you are both willing
and able to continue in this matter, or whether I must
make alternative arrangements. I do not want to be
the only one working hard with this law suit. . . .

Lebetkin also encouraged Giray to change law firms. On

August 23, Lebetkin emailed Giray a link to DLA Piper's website

and wrote, "I am looking into this firm for you."

On or about August 27, Lebetkin broke off his romantic relationship with Giray.  On September 2, Giray forwarded Lebetkin's email concerning DLA Piper to Sassoon.  Sassoon responded, "We are giving you our top priority you are number one. . . .  I will talk to you tomorrow."

On September 6, Giray signed and sent to Lebetkin a Termination Notice by certified mail.  It stated simply, "I hereby terminate your services as a consultant.  Please direct all future communications to my attorneys," RFS.

Post-Termination Events

Lebetkin acknowledges that he received the Termination Notice.  Nonetheless, he attempted to communicate with Giray later in September about litigation against Ulukaya.  Giray promptly rebuffed his efforts.  On September 14, Giray emailed Lebetkin,

> Steve
>
> Do not send me articles about my case.  You do not work for me.  Just now you tried to give me information about my case and I hang up on you.  I didn't listen.  My lawyers are helping me out and we do not need your help.

One minute later, Lebetkin replied, "I still do."

Over the next half hour, the two exchanged a flurry of emails.  Lebetkin wrote,

> There is another sworn business plan related to the new empire loan obtained this year prior to filing.

This is the same empire that underwrote the original
loan linking the two companies omitted by counsel in
the first draft of the document request which I
corrected.

Make sure you get this new plan and not make the same
mistake again which would have been quite harmful to
all of us.

Let me know when you get t[o] a negotiation stage and
I will be happy to complete the remaining part of the
engagement.

Giray replied,

You do not work for me.  Do not call me again.  Do not
e mail me.  I will block your e mails.  Your ideas are
ridiculous.  You called me this week to tell me that I
could make another 100 million dollars if I change
lawyers.  I am not interested.  I am happy with my
lawyers.

Lebetkin again:  "Our agreement stands."  Giray:  "It does not.

You are terminated[.]"  Lebetkin:  "Incorrect.  Read it.

Paragraph one.  Done."  Giray forwarded Lebetkin's last message

to her attorneys, with the message, "Please take care of this."

The contretemps then continued between Lebetkin and Feldman

in further September 14 emails.  Feldman wrote to Lebetkin,

As you know, Ayse has terminated any relationship with
you and has demanded that you cease and desist from
contacting her further concerning the case.  Despite
these demands, you have persisted in calling and
writing her about it.

You must cease these communications immediately as it
is a form of harassment.  Ayse does not want nor will
she accept any such communications.

Lebetkin replied, setting forth his position:

Services are substantially complete (see par. 1),
contract was not terminated, and no out clauses.
Contract prepared by Lew's firm in its entirety on
behalf of Ayse.  I previously sent you the email
string that has the document attached from the law
firm.

Saying it doesn't make it so.

As you and I discussed and agreed, 3% of the gross
settlement (or collected judgement) will be set aside
by you whenever it takes place, if it ever does take
place.

Again, if you call upon me to participate in the
negotiation and structuring side of this, I will honor
that remaining part of the engagement.

No sense having sour grapes by anyone[,] particularly
the parties that stand to benefit so handsomely from
what I have done.  It would be nice if someone said
thank you, instead of walking away from
responsibilities.  Very disappointing, all of you.
Not the behavior I would have expected.

Giray's suit against Ulukaya was filed on August 14, 2012,
in New York County Supreme Court.  The suit was settled in 2015.
Lebetkin requested 3% of that settlement from Giray, which she
has declined to provide.

Procedural History

Lebetkin filed this action in state court on September 6,
2018.  On September 7, the case was removed to federal court.
An Opinion and Order of December 14, 2018 addressed two motions
to dismiss.  Lebetkin v. Giray, No. 18cv8170 (DLC), 2018 WL
6591252, at *1 (S.D.N.Y. Dec. 14, 2018).

Discovery proceeded on Lebetkin's two surviving claims, both against Giray alone, for breach of contract and quantum meruit.  On September 13, 2019, Giray moved for summary judgment.  That motion became fully submitted on October 18, 2019.  On March 10, 2020, Lebetkin notified the Court that his separate action against Giray's attorneys, brought in state court, had been dismissed.  See Lebetkin v Feldman, No. 152745/2019, 2020 WL 228481, at *4 (N.Y. Sup. Ct. Jan. 15, 2020).

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).

"Where, as here, the party opposing summary judgment bears the burden of proof at trial, summary judgment should be granted if the moving party can point to an absence of evidence to support an essential element of the nonmoving party's claim." Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).  In making this determination, the court "draws all inferences in favor of the nonmoving party."  Id.  Once the moving party has made a showing that the non-movant's claims cannot be sustained, the party opposing summary judgment "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).

"[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment."  Ridinger v. Dow Jones & Co., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted).  Only disputes over material facts will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

I.   Breach of Contract

   A.   Legal Standard

Under New York law,[3] to recover for breach of contract the plaintiff must show "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages." Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011). "[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Arledge v. Stratmar Sys., Inc., 948 F.2d 845, 847–48 (2d Cir. 1991). The "fixed duration" sufficient to defeat the at-will presumption may be satisfied by a contract that promises

---

[3] The parties agree that New York law applies to Lebetkin's claims. As a New York federal court sitting in diversity jurisdiction, this Court applies the choice of law rules of New York. See Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003). "In contract cases, New York courts apply the 'center of gravity' or 'grouping of contacts' choice of law theory." Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 336 (2d Cir. 2005) (citation omitted). In tort cases, New York courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006) (citation omitted). All of the events at issue occurred in New York, and the underlying Giray-Ulukaya litigation was conducted in New York courts. Additionally, both Lebetkin and Giray were New York residents during the relevant time period. Finally, each of the parties has relied on New York law in addressing this motion. See Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009).

employment for a term of months or years.  See, e.g., TSR
Consulting Servs., Inc. v. Steinhouse, 699 N.Y.S.2d 375, 377
(N.Y. App. Div. 1999) (two-year duration).  A contract that
provides for employment until the occurrence of a particular
event may also defeat the at-will presumption.  Reddington v.
Staten Island Univ. Hosp., 511 F.3d 126, 137 (2d Cir. 2007) ("An
agreement can establish a fixed duration even if its duration
cannot be determined ab initio." (citation omitted)); Rooney v.
Tyson, 697 N.E.2d 571, 575-76 (N.Y. 1998) (agreement to employ a
boxing trainer "for as long as the boxer fights professionally"
is of sufficiently definite duration to defeat the at-will
presumption).

        "Under New York law, a party's performance under a contract
is excused where the other party has substantially failed to
perform its side of the bargain or, synonymously, where that
party has committed a material breach."  Merrill Lynch & Co.
Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir.
2007).  "Substantial performance is performance, the deviations
permitted being minor, unimportant, inadvertent, and
unintentional."  Bank of New York Mellon Tr. Co. v. Morgan
Stanley Mortg. Capital, Inc., 821 F.3d 297, 311 (2d Cir. 2016)
(citation omitted).

            There is no simple test for determining whether
        substantial performance has been rendered and several

factors must be considered, including the ratio of the
performance already rendered to that unperformed, the
quantitative character of the default, the degree to
which the purpose behind the contract has been
frustrated, the willfulness of the default, and the
extent to which the aggrieved party has already
received the substantial benefit of the promised
performance.

Hadden v. Consol. Edison Co. of New York, 312 N.E.2d 445, 449

(N.Y. 1974).

"[A] contract of employment for a definite term may not

lawfully be terminated by the employer, prior to the expiration

date in the absence of just cause." Rothenberg v. Lincoln Farm

Camp, Inc., 755 F.2d 1017, 1020–21 (2d Cir. 1985) (citation

omitted).  Where such a contract is silent as to the conditions

under which an individual's employment may be terminated, the

employer must have "good cause" for termination. Williamson v.

Moltech Corp., 690 N.Y.S.2d 628, 629 (N.Y. App. Div. 1999).

Insubordination by an employee is generally sufficient cause:

With regard to the employer-employee relationship, as
long as the directions of the employer, as the
principal, are reasonable, then the employee, as the
agent, must obey them, even if it appears that some
other course of conduct was better than that which the
employer chose.  An employer generally has just cause
to terminate an employment contract when an employee's
continuous refusal to comply with lawful and
reasonable directions of an employer reaches such
proportions as to be deleterious to the employer's
interests, is inconsistent with continuance of the
basic employer-employee relationship, and effectively
stalls the conduct of important and duly authorized
business affairs.

Race v. Goldstar Jewellery, LLC, 924 N.Y.S.2d 166, 167 (N.Y.
App. Div. 2011) (citation omitted).

    B.    Application

    The Agreement, which provides that it would terminate on
the "close or termination . . . or the close of negotiations and
settlement" of the Giray-Ulukaya lawsuit, was a contract to
employ Lebetkin for a definite term.  It could therefore be
terminated by Giray only for good cause.

    No reasonable jury could find that Giray lacked good cause
to terminate Lebetkin's services.  The Agreement required
Lebetkin to "perform and complete" services that included
"working with attorneys" who were representing Giray in
litigation against Ulukaya.  If -- as Lebetkin asserts -- his
responsibility was to act as a liaison between Giray and her
attorneys, it rapidly became clear that he was not capable of
effectively performing this duty.  Not only did he come into
conflict with the attorneys, Lebetkin repeatedly failed to do as
instructed by Giray, his employer.

    The Agreement was signed on July 16, 2012.  Within two
weeks, Giray advised Lebetkin that he was not acting with her
consent and wanted him to copy her on all of his communication
with her attorneys.  She had to repeat these instructions.  In
the August 23 email he sent from Giray's email account, Lebetkin

purported to express Giray's displeasure with her attorneys and that same day tried to convince her to change law firms.  On September 6, Giray terminated the consultancy.

Giray had adequate cause to terminate Lebetkin's employment by the time of the September 6 Termination Notice.  And she certainly had such cause by the time of their heated September 14 email exchange in which Giray wrote, "You are terminated." Lebetkin has not presented evidence that raises a question of fact regarding the existence of good cause for Giray's termination of his services.

Lebetkin argues that his consulting services were substantially performed by September 6, and that he is therefore entitled to his full contingency fee despite the termination.[4] Under the Agreement, Lebetkin was to "perform and complete services for; [sic] business consultation, review of business records, and working with attorneys and accountants, all in relation to a potential law suit (including settlement and negotiation talks)."  (Emphasis added.)  No reasonable jury could find that the work Lebetkin performed prior to September 6 constituted substantial performance of the services promised under the contract.  The Giray-Ulukaya litigation was not

---

[4] Lebetkin made the same assertion in his September 14, 2012 exchange with Feldman.

16

settled until 2015; the work Lebetkin performed -- from July 16

to September 6, 2012 -- was not a substantial portion of the

promised work.  And, as shown by the emails between Lebetkin and

Giray, even during that brief period Lebetkin proved unable to

perform successfully as a liaison between Giray and her

attorneys.

Lebetkin next argues that the terms of the Agreement made

it non-terminable or, alternatively, made his 3% contingency fee

a form of liquidated damages.  In particular, Lebetkin relies on

the following provision of the Agreement:

> **Term; Termination**.  This Agreement shall begin on the
> Effective Date and terminate on the close or
> termination of the Law Suit or the close of
> negotiations and settlement of the Law Suit (the
> "Term").  Any remedies for breach of this Agreement
> shall survive any termination or expiration.
> Notwithstanding termination of this Agreement, the
> fees due to Consultant shall be paid according to this
> Agreement.

(Emphasis added).  According to Lebetkin, the underlined

language rendered Giray powerless to avoid her duty under the

Agreement to pay him.

This argument fails as well.  It is unsupported by the

Agreement when its terms are read as a whole.  "[W]here the

terms of a contract are clear and unambiguous, the intent of the

parties must be found within the four corners of the contract,

giving a practical interpretation to the language employed and

reading the contract as a whole." <u>Tomhannock, LLC v. Roustabout</u>
<u>Res., LLC</u>, 128 N.E.3d 674, 675 (N.Y. 2019) (citation omitted).
The "Payment" clause provides, in relevant part, "<u>In</u>
<u>consideration of the Services performed by Consultant, Giray</u>
<u>agrees to pay</u> Consultant 3% of any recovery Giray receives from
the Law Suit." (Emphasis added). This language made Lebetkin's
performance a condition of payment. <u>Cf.</u> <u>Coletti v. Knox Hat</u>
<u>Co.,</u> 169 N.E. 648, 649 (N.Y. 1930) ("When the performance of a
contract consists in doing (faciendo) on one side, and in giving
(dando) on the other side, the doing must take place before the
giving."). Indeed, Lebetkin agreed to "perform <u>and complete</u>"
the consulting services. (Emphasis added.) Consequently, there
were no "fees due to Consultant" at the time Giray terminated
the Agreement or thereafter.

Lebetkin argues that in a recent decision in related
litigation, to wit, a lawsuit that Lebetkin brought against
Giray's attorneys, the Supreme Court of New York has adopted his
preferred interpretation -- that "the obligation to pay the
monies due to the Plaintiff under the Agreement survive[s]
termination of the Agreement." <u>Lebetkin</u>, 2020 WL 228481, at *2.
In his state court lawsuit against the attorneys, Lebetkin
pleaded claims for unjust enrichment, tortious interference with
existing contract, breach of fiduciary duty, and prima facie

tort.  Id. at *2-4.  The latter three claims were dismissed on
statute of limitations grounds.  Id. at *3-4.

With respect to the unjust enrichment claim, the New York
Supreme Court held that Lebetkin failed to state a claim because
he had insufficiently alleged that RFS or its attorneys were
enriched by the termination of Lebetkin's consultancy.  Id. at
*2.  Because the New York Supreme Court reached this conclusion
on a motion to dismiss claims brought against Giray's attorneys,
it did not have occasion to consider the factual record
available on this summary judgment motion -- in particular the
evidence that Giray effected a for-cause termination of
Lebetkin's employment -- or any need to consider the
interrelationship between the termination clause of the
Agreement and the Agreement's description of the services that
Lebetkin was obligated to provide Giray.  The state court
decision, therefore, provides no basis to revisit the
determination that Giray's motion for summary judgment on the
breach of contract claim must be granted.

II.  Quantum Meruit

A.  Legal Standard

"In order to recover in quantum meruit under New York law,
a claimant must establish (1) the performance of services in
good faith, (2) the acceptance of the services by the person to

whom they are rendered, (3) an expectation of compensation

therefor, and (4) the reasonable value of the services." Mid-

Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,

418 F.3d 168, 175 (2d Cir. 2005) (citation omitted).  A

plaintiff who successfully recovers in quantum meruit "recovers

the reasonable value of his performance whether or not the

defendant in any economic sense benefitted from the

performance." Brennan Beer Gorman/Architects, LLP v. Cappelli

Enterprises, Inc., 925 N.Y.S.2d 25, 27 (N.Y. App. Div. 2011)

(citation omitted).  Accordingly, the reasonable value of

services for the purposes of quantum meruit is generally

established not on a contingency basis, but through a measure

such as the number of hours of work performed multiplied by a

reasonable hourly rate.  See, e.g., Caribbean Direct, Inc. v.

Dubset, LLC, 954 N.Y.S.2d 66, 67 (N.Y. App. Div. 2012) (hours of

work and costs incurred by plaintiff website designer); Brennan

Beer Gorman/Architects, 925 N.Y.S.2d at 27 (hours of work by

plaintiff's architects and engineers).

     B.   Application

     Defendant has not contested the first three elements of

Lebetkin's quantum meruit claim; instead, Giray argues that

Lebetkin has failed to produce any proof of the reasonable value

of his services.  In response to defendant's motion, Lebetkin

has cited no evidence concerning the value of his services. Instead, he avers that such proof "has not been specifically requested in discovery by Defendant heretofore." This argument misconstrues the burden placed upon the plaintiff. Lebetkin has brought a claim for unjust enrichment, and it is now his burden to present evidence in support of his claim.

Giray has identified an absence of evidence to support an element of Lebetkin's quantum meruit claim. See Gemmink, 807 F.3d at 48. In response, Lebetkin has failed to present evidence that would create a triable issue of fact concerning the value of his services. This absence of evidence is not surprising given that the consultancy was so short-lived and that Lebetkin was at loggerheads with both his employer and her attorneys throughout that brief period. Summary judgment is therefore appropriate on this claim as well. See Wright, 554 F.3d at 266.

## Conclusion

Giray's September 13, 2019 motion for summary judgment is

granted.  The Clerk of Court shall enter judgment for the

defendant.

Dated:    New York, New York
          March 25, 2020

                                DENISE COTE
                   United States District Judge